A QUANTITY OF COPIES OF BOOKS et al. *v.*
KANSAS.

No. 449.   Argued April 1–2, 1964.—Decided June 22, 1964.

*Stanley Fleishman* argued the cause for appellants. With him on the briefs was *Sam Rosenwein*.

*William M. Ferguson,* Attorney General of Kansas, argued the cause for appellee. With him on the brief were *Robert E. Hoffman, J. Richard Foth* and *Richard H. Seaton,* Assistant Attorneys General of Kansas, and *William Clement.*

The following State Attorneys General joined in the brief for appellee: *Waggoner Carr* of Texas, *Richard W. Ervin* of Florida, *Forrest H. Anderson* of Montana, *Frank L. Farrar* of South Dakota, *Bruce Bennett* of Arkansas, *Helgi Johanneson* of North Dakota, *Frank E. Hancock* of Maine, *Robert W. Pickrell* of Arizona, *Robert Y. Thornton* of Oregon, *Thomas B. Finan* of Maryland, *David P. Buckson* of Delaware, *Bert T. Kobayashi* of Hawaii, *Robert Matthews* of Kentucky, *William Maynard* of New Hampshire, *Duke W. Dunbar* of Colorado, *Eugene Cook* of Georgia, *Allan Shepard* of Idaho, *Stanley Mosk* of California, and *J. Joseph Nugent* of Rhode Island.

MR. JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE, MR. JUSTICE WHITE, and MR. JUSTICE GOLDBERG join.

Under a Kansas statute authorizing the seizure of allegedly obscene books before an adversary determina-

tion of their obscenity and, after that determination, their destruction by burning or otherwise,[1] the Attorney General of Kansas obtained an order from the District Court of Geary County directing the sheriff of the county to seize and impound, pending hearing, copies of certain

---

[1] The statute is Kan. Gen. Stat. § 21–1102 *et seq.* (Supp. 1961). Section 1 of Kan. Laws 1961, c. 186 (§ 21–1102), constitutes the selling or distribution of obscene materials (obscenity is defined in § 1 (b)) a criminal misdemeanor punishable by fine or imprisonment or both. Section 4 (§ 21–1102c) provides for the search and seizure procedure here involved:

"Whenever any district, county, common pleas, or city court judge or justice of the peace shall receive an information or complaint, signed and verified upon information and belief by the county attorney or the attorney general, stating there is any prohibited lewd, lascivious or obscene book, magazine, newspaper, writing, pamphlet, ballad, printed paper, print, picture, motion pictures, drawing, photograph, publication or other thing, as set out in section 1 [21–1102] (*a*) of this act, located within his county, it shall be the duty of such judge to forthwith issue his search warrant directed to the sheriff or any other duly constituted peace officer to seize and bring before said judge or justice such a prohibited item or items. Any peace officer seizing such item or items as hereinbefore described shall leave a copy of such warrant with any manager, servant, employee or other person appearing or acting in the capacity of exercising any control over the premises where such item or items are found or, if no person is there found, such warrant may be posted by said peace officer in a conspicuous place upon the premises where found and said warrant shall serve as notice to all interested persons of a hearing to be had at a time not less than ten (10) days after such seizure. At such hearing, the judge or justice issuing the warrant shall determine whether or not the item or items so seized and brought before him pursuant to said warrant were kept upon the premises where found in violation of any of the provisions of this act. If he shall so find, he shall order such item or items to be destroyed by the sheriff or any duly constituted peace officer by burning or otherwise, at such time as such judge shall order, and satisfactory return thereof made to him: *Provided, however,* Such item or items shall not be destroyed so long as they may be needed as evidence in any criminal prosecution."

paperback novels at the place of business of P–K News Service, Junction City, Kansas. After hearing, the court entered a second order directing the sheriff to destroy the 1,715 copies of 31 novels which had been seized. The Kansas Supreme Court held that the procedures met constitutional requirements and affirmed the District Court's order. 191 Kan. 13, 379 P. 2d 254. Probable jurisdiction was noted, 375 U. S. 919. We conclude that the procedures followed in issuing the warrant for the seizure of the books, and authorizing their impounding pending hearing, were constitutionally insufficient because they did not adequately safeguard against the suppression of nonobscene books. For this reason we think the judgment must be reversed. Therefore we do not reach, and intimate no view upon, the appellants' contention that the Kansas courts erred in holding that the novels are obscene.

Section 4 of the Kansas statute requires the filing of a verified Information stating only that "upon information and belief . . . there is [an] . . . obscene book . . . located within his county." The State Attorney General went further, however, and filed an Information identifying by title 59 novels, and stating that "each of said books [has] been published as 'This is an original Nightstand Book.' " He also filed with the Information copies of seven novels published under that caption, six of which were named by title in the Information; particular passages in the seven novels were marked with penciled notations or slips of paper. Although also not expressly required by the statute, the district judge, on application of the Attorney General, conducted a 45-minute *ex parte* inquiry during which he "scrutinized" the seven books; at the conclusion of this examination, he stated for the record that they "appear to be obscene literature as defined" under the Kansas statute "and give this Court reasonable grounds to believe that any paper-

backed publication carrying the following: 'This is an original Night Stand book' would fall within the same category . . . ." He issued a warrant which authorized the sheriff to seize only the particular novels identified by title in the Information. When the warrant was executed on the date it was issued, only 31 of the titles were found on P–K's premises. All copies of such titles, however, 1,715 books in all, were seized and impounded. At the hearing held 10 days later pursuant to a notice included in the warrant, P–K made a motion to quash the Information and the warrant on the ground, among others, that the procedure preceding the seizure was constitutionally deficient. The claim was that by failing first to afford P–K a hearing on the question whether the books were obscene, the procedure "operates as a prior restraint on the circulation and dissemination of books" in violation of the constitutional restrictions against abridgment of freedom of speech and press. The motion was denied, and following a final hearing held about seven weeks after the seizure (the hearing date was continued on motion of P–K), the court held that all 31 novels were obscene and ordered the sheriff to stand ready to destroy the 1,715 copies on further order.

The steps taken beyond the express requirements of the statute were thought by the Attorney General to be necessary under our decision in *Marcus* v. *Search Warrant,* 367 U. S. 717, decided a few weeks before the Information was filed. *Marcus* involved a proceeding under a strikingly similar Missouri search and seizure statute and implementing rule of court. See 367 U. S. 719, at notes 2, 3. In *Marcus* the warrant gave the police virtually unlimited authority to seize any publications which they considered to be obscene, and was issued on a verified complaint lacking any specific description of the publications to be seized, and without prior submission of any publications whatever to the judge issuing the warrant.

We reversed a judgment directing the destruction of the copies of 100 publications held to be obscene, holding that, even assuming that they were obscene, the procedures leading to their condemnation were constitutionally deficient for lack of safeguards to prevent suppression of nonobscene publications protected by the Constitution.

It is our view that since the warrant here authorized the sheriff to seize all copies of the specified titles, and since P–K was not afforded a hearing on the question of the obscenity even of˙ the seven novels before the warrant issued, the procedure was likewise constitutionally deficient.[2] This is the teaching of *Kingsley Books, Inc.,* v. *Brown,* 354 U. S. 436. See *Marcus,* at pp. 734–738. The New York injunctive procedure there sustained does not afford *ex parte* relief but postpones all injunctive relief until "both sides have had an opportunity to be heard." *Tenney* v. *Liberty News Distributors,* 13 App. Div. 2d 770, 215 N. Y. S. 2d 663, 664. In *Marcus* we explicitly said that *Kingsley Books* "does not support the proposition that the State may impose the extensive restraints imposed here on the distribution of these publications prior to an adversary proceeding on the issue of obscenity, irrespective of whether or not the material is legally obscene." 367 U. S., at 735–736. A seizure of all copies of the named titles is indeed more repressive than an injunction preventing further sale of the books. State regulation of obscenity must "conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line." *Bantam Books, Inc.,* v. *Sullivan,* 372 U. S. 58, 66; the Constitution requires a procedure "designed to focus searchingly on the question of obscenity," *Marcus,* p. 732. We therefore

---

[2] P–K News Service also asserts that its constitutional right against unreasonable searches and seizures was violated. The result here makes it unnecessary to pass upon this contention.

conclude that in not first affording P–K an adversary hearing, the procedure leading to the seizure order was constitutionally deficient. What we said of the Missouri procedure, *id.*, at 736–737, also fits the Kansas procedure employed to remove these books from circulation:

". . . there is no doubt that an effective restraint—indeed the most effective restraint possible—was imposed prior to hearing on the circulation of the publications in this case, because all copies on which the [sheriff] could lay [his] hands were physically removed . . . from the premises of the wholesale distributor. An opportunity . . . to circulate the [books] . . . and then raise the claim of nonobscenity by way of defense to a prosecution for doing so was never afforded these appellants because the copies they possessed were taken away. Their ability to circulate their publications was left to the chance of securing other copies, themselves subject to mass seizure under other such warrants. The public's opportunity to obtain the publications was thus determined by the distributor's readiness and ability to outwit the police by obtaining and selling other copies before they in turn could be seized. In addition to its unseemliness, we do not believe that this kind of enforced competition affords a reasonable likelihood that nonobscene publications, entitled to constitutional protection, will reach the public. A distributor may have every reason to believe that a publication is constitutionally protected and will be so held after judicial hearing, but his belief is unavailing as against the contrary [*ex parte*] judgment [pursuant to which the sheriff] . . . seizes it from him."

It is no answer to say that obscene books are contraband, and that consequently the standards governing searches and seizures of allegedly obscene books should

not differ from those applied with respect to narcotics, gambling paraphernalia and other contraband. We rejected that proposition in *Marcus*. We said, 367 U. S., at 730–731:

> "The Missouri Supreme Court's assimilation of obscene literature to gambling paraphernalia or other contraband for purposes of search and seizure does not therefore answer the appellants' constitutional claim, but merely restates the issue whether obscenity may be treated in the same way. The authority to the police officers under the warrants issued in this case, broadly to seize 'obscene . . . publications,' poses problems not raised by the warrants to seize 'gambling implements' and 'all intoxicating liquors' involved in the cases cited by the Missouri Supreme Court. 334 S. W. 2d, at 125. For the use of these warrants implicates questions whether the procedures leading to their issuance and surrounding their execution were adequate to avoid suppression of constitutionally protected publications. '. . . [T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn. . . . The separation of legitimate from illegitimate speech calls for . . . sensitive tools . . . .' *Speiser* v. *Randall*, 357 U. S. 513, 525. It follows that, under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity as here involved without regard to the possible consequences for constitutionally protected speech."

See also *Smith* v. *California*, 361 U. S. 147, 152–153.

Nor is the order under review saved because, after all 1,715 copies were seized and removed from circulation, P–K News Service was afforded a full hearing on the

question of the obscenity of the novels. For if seizure of books precedes an adversary determination of their obscenity, there is danger of abridgment of the right of the public in a free society to unobstructed circulation of nonobscene books. *Bantam Books* v. *Sullivan, supra; Roth* v. *United States,* 354 U. S. 476; *Marcus* v. *Search Warrant, supra; Smith* v. *California, supra.* Here, as in *Marcus,* "since a violation of the Fourteenth Amendment infected the proceedings, in order to vindicate appellants' constitutional rights" 367 U. S., at 738, the judgment resting on a finding of obscenity must be reversed.

*Reversed.*

Opinion of MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins.

The Kansas State Court judgment here under review orders that 1,715 copies of 31 novels be burned or otherwise destroyed. This book-burning judgment was based upon findings by the trial judge that "the core [of the books] would seem to be that of sex, with the plot, if any, being subservient thereto," that the "dominant purpose [of the books] was calculated to effectively incite sexual desires" and that "they would have this effect on the average person residing in this community . . . ." Relying on these findings and this Court's holding in *Roth* v. *United States,* 354 U. S. 476, the trial court held that the books "are not entitled to the . . . protection" of the First Amendment to the Constitution. The State Supreme Court affirmed on the same grounds.

This Court now reverses. I concur in the judgment of reversal but do not find it necessary to consider the procedural questions. Compare *Marcus* v. *Search Warrant,* 367 U. S. 717, 738 (concurring opinion). The Kansas courts may have been right to rely upon the Court's *Roth* holding in ordering these books burned or

otherwise destroyed. For reasons stated in the *Roth* case in a dissent by MR. JUSTICE DOUGLAS, 354 U. S., at 508, in which I joined, I think the *Roth* case was wrongly decided. It is my belief, as stated in that dissent by MR. JUSTICE DOUGLAS, in my concurring opinions in *Smith* v. *California,* 361 U. S. 147, 155, and *Kingsley International Pictures Corp.* v. *Regents,* 360 U. S. 684, 690, and in my dissent in *Beauharnais* v. *Illinois,* 343 U. S. 250, 267, which MR. JUSTICE DOUGLAS joined, that the Kansas statute ordering the burning of these books is in plain violation of the unequivocal prohibition of the First Amendment, made applicable to the States by the Fourteenth, against "abridging the freedom of speech, or of the press."

Because of my belief that both *Roth* and *Beauharnais* draw blueprints showing how to avoid the First Amendment's guarantee of freedoms of speech and press, I would overrule both those cases as well as reverse the judgment here.

MR. JUSTICE STEWART, concurring in the judgment.

If this case involved hard-core pornography, I think the procedures which were followed would be constitutionally valid, at least with respect to the material which the judge "scrutinized." This case is not like *Marcus* v. *Search Warrant,* 367 U. S. 717, where, as the Court notes, "the warrant gave the police virtually unlimited authority to seize any publications which they considered to be obscene, and was issued on a verified complaint lacking any specific description of the publications to be seized, and without prior submission of any publications whatever to the judge issuing the warrant," p. 209, *supra.* But the books here involved were not hard-core pornography. Therefore, I think Kansas could not by any procedure constitutionally suppress them, any more than

Kansas could constitutionally make their sale or distribution a criminal act. See *Jacobellis* v. *Ohio, ante,* p. 197. (STEWART, J., concurring).

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, dissenting.

Insofar as the judgment of the Court rests on the view of three of my Brethren that a State cannot constitutionally ban on grounds of obscenity the books involved in this case, I dissent on the basis of the views set out in my opinion in *Jacobellis* v. *Ohio, ante,* p. 203. It is quite plain that these so-called "novels" have "been reasonably found in state judicial proceedings to treat with sex in a fundamentally offensive manner" and that the State's criteria for judging their obscenity are rational.

I also disagree with the position taken in the opinion of my Brother BRENNAN that this Kansas procedure unconstitutionally abridged freedom of expression in that the search warrant (1) authorized seizure of *all* copies of the books in question and (2) was issued without an adversary hearing on the issue of their obsceneness. In my opinion that position is inconsistent with the thrust of prior cases and serves unnecessarily to handicap the States in their efforts to curb the dissemination of obscene material.[1]

---

[1] The books before the district judge at the *ex parte* hearing were:

| | |
|---|---|
| *The Sinning Season* | *Sin Song* |
| *Backstage Sinner* | *The Wife-Swappers* |
| *Lesbian Love* | *Sex Circus* |
| *Sin Hotel* | |

The front cover of *The Wife-Swappers* is typical of the 31 books seized which, with the exception of *Backstage Sinner,* included all those examined by the judge. Above a highly suggestive pictorial representation, the prospective reader is told that "Members of this Lust Club Had a Different Woman Every Night!" At the bottom

## I.

The two cases on which MR. JUSTICE BRENNAN's opinion almost entirely relies are *Kingsley Books, Inc.,* v. *Brown,* 354 U. S. 436, and *Marcus* v. *Search Warrant,* 367 U. S. 717.

In *Kingsley Books,* appellants challenged the constitutionality of a New York statute that authorized the State Supreme Court to enjoin the sale and distribution of obscene prints and articles. A complaint prayed for an injunction against the further distribution of certain allegedly obscene paperback books and for the destruction by the sheriff of all copies in the appellants' possession. Appellants were ordered to show cause within four days why an injunction *pendente lite* should not be issued that would preclude distribution of the books. Although the code of criminal procedure provided that anyone sought to be enjoined was entitled to a trial one day after the joinder of issue, appellants consented to the temporary

---

of the cover it is stated that "This is an Original Nightstand Book." The back cover relates in more detail the book's contents:

"PROBLEMS IN BED . . . were no problems at all to the members of Eastport's highly secret suburban switch club. Who could have problems with eight beautiful, different women to choose from? For that was the lot of each man in this fantastic sex-prowling group. Eight of the most lusty, passionate women in the town, each with her different desires, her peculiar sex habits. And with eight women so easy to reach, it was inevitable that there would be trouble . . . for the wives were very different: one was a lesbian, one was a nymphomaniac, one a masochist, another frigid, and still another erupting like a bomb at the mere touch of a man. They lived a lust-ridden, lightning-fast, terrifying and sex-crammed . . . GAME OF WIFE-SWAPPING!"

The front page of the book contains the following:

"LUST-SATED COUPLES

"In eight Eastport homes the doors opened and eight husbands returned. It's traditional in suburbia for the good wife to meet her spouse with a shaker of martinis, but it was different with these eight

injunction and delayed bringing the matter to issue. When a hearing on the question of obscenity was finally had, the books were found to be obscene; their distribution was enjoined and their destruction ordered. This Court upheld the New York procedure, stating:

> "Authorization of an injunction *pendente lite,* as part of this scheme, during the period within which the issue of obscenity must be promptly tried and adjudicated in an adversary proceeding for which '[a]dequate notice, judicial hearing, [and] fair deter-

particular Eastport couples. These eight husbands came home on a Sunday morning and their eight wives were waiting in bed, soft and warm and sated . . . smelling of other men. And the husbands were drained and tired . . . from other women. Later in the day they would all awake, lounge around the house, eat lightly, speak softly . . . and think of the night before . . .

"These Eight Couples Are
Members Of A Wife-Swapping
Mate-Switching Sex Club
So Vile It will Stun You."

These inducements are a fair indication of the actual contents of the book. The book's back page advertises the titles of some other Nightstand Books. The other books seized were:

| | |
|---|---|
| *Born for Sin* | *Isle of Sin* |
| *No Longer a Virgin* | *Orgy Town* |
| *Sin Girls* | *Lover* |
| *Miami Call Girl* | *Sex Spy* |
| *Passion Trap* | *Trailer Trollop* |
| *Sex Jungle* | *Sin Cruise* |
| *The Lustful Ones* | *Flesh Is My Undoing* |
| *Sex Model* | *Malay Mistress* |
| *The Lecher* | *Love Nest* |
| *Lust Goddess* | *Seeds of Sin* |
| *Sin Camp* | *Passion Slave* |
| *$20 Lust* | *The Sinful Ones* |
| *Convention Girl* | |

Each of the seized books contains exactly 192 pages, the text in each running from page 5 to pages 189, 190, 191, or 192.

mination' are assured, . . . is a safeguard against frustration of the public interest in effectuating judicial condemnation of obscene matter." P. 440.

The State was not, we held, limited to the criminal process in attempting to protect its citizens against the circulation of pornography; it "is not for this Court thus to limit the State in resorting to various weapons in the armory of the law." P. 441. The Court pointed out that "Criminal enforcement and the proceeding under § 22–a interfere with a book's solicitation of the public precisely at the same stage," p. 442, that the threat of criminal penalties may be as effective a deterrent against expression as an injunctive civil remedy, and that an injunction against someone to forbear selling specific books may be a less stringent restraint on his freedom of expression than sending him to jail. *Near* v. *Minnesota,* 283 U. S. 697, was distinguished on the ground that the New York statute dealt with obscenity rather than matters deemed to be derogatory to a public officer and imposed no direct restraint on materials not yet published.

In *Marcus* v. *Search Warrant* warrants to seize books were issued solely on the judgment of a peace officer regarding the obscenity of certain books without any independent examination by a judicial official; the warrants authorized seizure of books by officers other than the one who had signed the complaints and in effect gave *carte blanche* to these officers to seize anything they considered obscene at the named wholesale establishment and newsstands, whether or not the material had been so evaluated by anyone prior to the issuance of the warrants. After recounting the historical distrust for systems sanctioning sweeping seizures of materials believed to be offensive to the state, the Court held that "Missouri's procedures as applied in this case lacked the safeguards which due process demands to assure nonobscene material the con-

stitutional protection to which it is entitled." P. 731. Relevant to this conclusion were the absence of any "scrutiny by the judge of any materials considered by the complainant to be obscene," p. 732, and the power of the enforcing officers under the warrants to make *ad hoc* decisions regarding obscenity although "They were provided with no guide to the exercise of informed discretion, because there was no step in the procedure before seizure designed to focus searchingly on the question of obscenity." P. 732. *Kingsley Books* was distinguished on the grounds that in that case: (1) the court "could exercise an independent check on the judgment of the prosecuting authority at a point before any restraint took place"; (2) the restraints "ran only against the named publication"; (3) no extensive restraints were imposed before an adversary proceeding; and (4) the New York code required decision within two days of the trial on the obscenity question, pp. 735–737.

In my view, the present case is governed by the principles serving to sustain the New York procedure involved in *Kingsley Books* rather than those which condemned that followed by Missouri in *Marcus*.

(1) Although the Kansas statute does not in terms require an independent judicial examination of allegedly obscene materials before authorization of seizure, the Kansas officials in this case conformed their procedures to what they believed to be the requirements of *Marcus*. The information included the titles of 59 "Original Nightstand Books." Seven of these were delivered to the district judge at 5 p. m., three hours before the 45-minute *ex parte* hearing at which the judge concluded that there were reasonable grounds to believe that all 59 books were obscene.[2] Because of the nature of the seven books examined by the judge, he could fairly reach a judgment that

---

[2] The record does not show how much attention the judge gave to these books before the hearing.

the remaining books were of the same character.[3] (See note 1, *supra.*)

(2) In this case, unlike *Marcus,* the officers had no discretion as to which books they might seize but could take only books specifically designated by their titles.

(3) It is true that the Kansas procedure, like that in *Marcus,* imposed a restraint before an adversary proceeding, but it would be highly artificial to consider this the controlling difference between *Kingsley Books* and *Marcus.* While the New York statute allows an almost immediate hearing on the obscenity issue, it would be unrealistic to suppose that most persons who allegedly have or sell obscene materials will be able to prepare for such a hearing in four days, the time between the issuance of the complaint and the *pendente lite* injunction in *Kingsley Books.* In practical terms, therefore, the New York scheme, as approved by this Court, does contemplate restraint before a hearing on the merits. Although the Court was uncertain in *Kingsley Books* whether New York would punish for contempt one who disseminated materials in disobedience of the temporary injunction if such materials were ultimately held to be not covered by the statute or constitutionally protected, it could hardly

---

[3] No one has asserted that any of these books has literary merit. The district judge contrasted them to books in which sex is subservient to the plot: "[I]n the books in question, the core would seem to be that of sex, with the plot, if any, being subservient thereto." The State Supreme Court, more succinctly, but with equal truth, stated, "They are trash." The essence of these books may be ascertained with great celerity, so replete are they with passages descriptive of sexual activities running the gamut from ordinary intercourse to lesbianism, sadism, public displays, and group orgies, and so lacking are they of any other content. Moreover, they are so standardized that a judge's estimate concerning the contents of absent books from an examination of seven books before him could be almost as surefire as a similar estimate of the character of unseen Mickey Mouse comic books based on a perusal of seven issues.

have failed to recognize the patently chilling effect such an injunction would have on the dissemination of named materials. In pragmatic terms then, the nature of the restraint imposed by the Kansas statute is not in a constitutionally significant sense different from that sustained in *Kingsley Books.*[4]

(4) The Kansas statute does not contain the safeguards for speedy disposition that were present in *Kingsley Books,* but the State Attorney General has unequivocally acknowledged the necessity of administering that statute in light of the constitutional requirements of *Marcus.* In this instance the warrant which was issued July 27 for seizure of the books contained a notice that a hearing on the merits was set for August 7. Eleven days is certainly not an undue delay; indeed, it is difficult to imagine a defense being prepared in less time. The district judge's decision was issued four days after the termination of the trial on the obscenity question, which had been postponed because of motions made by appellants. On the basis of this case, we have every reason to believe that the prosecuting authorities and judges of Kansas are aware that prehearing restraints may not be magnified by delay and we have no reason to think the Kansas statute

---

[4] What the courts of the State have subsequently said in dictum about the operation of the New York statute is hardly relevant to this Court's understanding of the import of the section at the time of *Kingsley Books,* and the constitutional principle for which that case stands. At any rate, *Tenney* v. *Liberty News Distributors,* 13 App. Div. 2d 770, 215 N. Y. S. 2d 663, states only that an injunction cannot be issued *ex parte;* this certainly does not mean that a court is forbidden to do what it did in *Kingsley Books,* grant an injunction before there is an adversary hearing on the *obscenity issue itself.* Surely the right to be heard on the subsidiary question of the wisdom of granting a *pendente lite* injunction would not save an otherwise unconstitutional scheme; and the failure to accord such a right does not render the Kansas procedure unconstitutional if it is otherwise valid.

will be applied in a manner any less fair in this regard to those restricted than the provision of the New York code sustained in *Kingsley Books*.

## II.

Since there may be lurking in my Brother BRENNAN's opinion the unarticulated premise that this Kansas procedure is impermissible because it operates as a "prior restraint," I deem it appropriate to make a few observations on that score. The doctrine of prior restraint is not a "self-wielding sword" or a "talismanic test" (*Kingsley Books, supra,* at 441) but one whose application in any instance requires "particularistic analysis." *Id.,* at 442; Freund, The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533, 539; cf. *Times Film Corp.* v. *Chicago,* 365 U. S. 43. That the Kansas procedure, as applied in this case, falls within permissible limits of the Fourteenth Amendment will appear from contrasting some of the reasons for the historic distrust in common law jurisprudence of any kind of censorship of writings, see *Near* v. *Minnesota,* 283 U. S. 697, 713–718,[5] with what was done here.

In the typical censorship situation material is brought as a matter of course before some administrative authority, who then decides on its propriety. This means that the State establishes an administrative structure whereby all writings are reviewed before publication. By contrast, if the State uses its penal system to punish expression outside permissible bounds, the State does not comprehensively review any form of expression; it merely considers after the event utterances it has reason to suppose may be prohibited. The breadth of its review of expression is therefore much narrower and the danger that

---

[5] See generally, *e. g.,* Emerson, The Doctrine of Prior Restraint, 20 Law and Contemp. Prob. 648 (1955); Freund, The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533, 537–545 (1951).

protected expression will be repressed is less. The operation of the Kansas statute resembles the operation of a penal rather than a licensing law in this regard since books are not as a matter of course subjected to prepublication state sanctioning but are reviewed only when the State has reason to believe they are obscene.

There are built-in elements in any system of licensing or censorship, the tendency of which is to encourage restrictions of expression. The State is not compelled to make an initial decision to pursue a course of action, since the original burden is on the citizen to bring a piece of writing. before it. The censor is a part of the executive structure, and there is at least some danger that he will develop an institutionalized bias in favor of censorship because of his particular responsibility. In a criminal proceeding, however, the burden is on the State to act, the decision-maker belongs to an independent branch of the government, and neither a judge nor a juror has any personal interest in active censorship. The Kansas practice is thus analogous to a system of penal sanctions rather than censorship in all three of these respects.

One danger of a censorship system is that the public may never be aware of what an administrative agent refuses to permit to be published or distributed. A penal sanction assures both that some overt thing has been done by the accused and that the penalty is imposed for an activity that is not concealed from the public. In this case, the information charged that obscene books were possessed or kept for sale and distribution; presumably such possession, if knowing, could, as a constitutional matter, support a criminal prosecution. The procedure adopted by the State envisions that a full judicial hearing will be held on the obscenity issue. Finally, the federal system makes it highly unlikely that the citizenry of one State will be unaware of the kind of material that is being restricted by its own government when there is great

divergence among the policies of the various States and a high degree of communication across state lines. Cf. my opinion in *Roth* v. *United States*, 354 U. S. 476, 496, and my dissenting opinion in *Jacobellis* v. *Ohio, ante,* p. 203, decided today.

Any system of censorship, injunction, or seizure may of course to some extent serve to trammel, by delaying distribution or otherwise, freedom of expression; yet so may the threat of criminal prosecution, as this Court noted in *Kingsley Books.* The bringing of a criminal charge may result in a cessation of distribution during litigation, since even an accused relatively confident of the unlikelihood or impermissibility of conviction may well refuse to take the added risk of further criminal penalties that might obtain if he guesses wrong and continues to disseminate the questionable materials. More fundamentally, the delay argument seems artificial in the context of this case and in the area of obscenity generally. Both the incentive for officials to promote delay and the adverse consequences of delay are considerably less in this area than in the field of political and social expression. If controversial political writings attack those in power, government officials may benefit from suppression although society may suffer. In the area of obscenity, there is less chance that decision-makers will have interests which may affect their estimate of what is constitutionally protected and what is not. It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them. A delay of even a day or two may be of crucial importance in some instances. On the other hand, the subject of sex is of constant but rarely particularly topical interest.[6]

---

[6] Reasons such as these may explain in part why the Court in *Near* v. *Minnesota*, 283 U. S. 697, 716, apparently believed that the whole prior restraint doctrine was inapplicable in the area of obscenity.

Distribution of *Ulysses* may be thought by some to be more important for society than distribution of the daily newspaper, but a one- or two-month delay in circulation of the former would be of small significance whereas such a delay might be effective suppression of the latter.

Finally, it may be said that any system of civil enforcement allows expression to be limited without the strict safeguards of criminal procedures and rules of evidence. The contention that such protections are essential is perhaps weaker in the area of obscenity than with regard to other kinds of expression for reasons outlined above. A substantial restriction on freedom of expression is undoubtedly provided by civil remedies for defamation, and there is no reason for foreclosing a State from reasonable civil means of preventing the distribution of obscene materials.

The opinion of MR. JUSTICE BRENNAN, in my view, straitjackets the legitimate attempt of Kansas to protect what it considers an important societal interest. It does so in contradiction of a sensible reading of the precedents and without contributing in any genuine way to the furtherance of freedom of expression that our Constitution protects.

For the foregoing reasons I would affirm the judgment of the Kansas Supreme Court.