DRIVE IN THEATRES, INC., t/a Midway Drive In Theatre, Plaintiff,

v.

Damon HUSKEY, Sheriff of Rutherford County, North Carolina, Defendant.

No. 2528.

United States District Court
W. D. North Carolina,
Charlotte Division.

Oct. 9, 1969.

Norman B. Smith, Greensboro, N. C., George Daly, Jr., and Adam Stein, Charlotte, N. C., for plaintiff.

J. Nat Hamrick, Rutherfordton, N. C., for defendant.

ORDER

McMILLAN, District Judge.

This case was heard in Charlotte on September 11 and September 19, 1969,

upon the motion of the plaintiff for a preliminary injunction restraining the defendant from perpetuating an alleged ban on the showing of "adult" motion pictures.

The corporate plaintiff, apparently owned by Susan Dantzic and Irvin Dantzic, operates the Midway Drive In Theatre in Rutherford County, North Carolina. The plaintiff gets films from a booking agency which sends an assortment of films according to a schedule. Practically all films have code "ratings" which may be "G" (recommended for general audiences); "M" (recommended for adults); "R" (recommended for persons under sixteen only with a parent or adult guardian) or "X" (not recommended for persons under sixteen).

These ratings or labels are not those of the plaintiff nor the defendant, but they are put on the films by the producers.

On June 19, 1969, the defendant, the Sheriff of Rutherford County, raided the Midway Drive In Theatre, confiscated several cans of film including the movies "The Ramrodder" and "A Piece of Her Action," and lodged several criminal charges against Susan Dantzic. Susan Dantzic entered a guilty plea on the charge of exhibiting obscene pictures when she was tried in the Superior Court of Rutherford County, and received a sentence suspended on certain conditions referred to in the testimony but not fully known to this court.

Shortly after the Dantzic criminal prosecution was concluded the defendant, Sheriff Huskey, announced to various witnesses, including several newspaper men and some theatre operators and others, that he intended to enforce the North Carolina statutes against obscenity; that he considered as obscene and unlawful any motion picture which depicted any nude woman or any act of sexual intercourse; that he considered all "adult" films to be obscene; that he considered all "X" and all "R" films to be obscene; that anyone showing films in those categories would be prosecuted and the film would be confiscated. He announced a plan to "stop all adult rated films unless they stopped themselves" in his county.

The Sheriff's statements were reported in the Forest City COURIER for Monday, August 18, 1969 under the headline "Sheriff Bans All Adult Movies." A copy of the story from that newspaper is attached to this order as Exhibit A. The Sheriff was quoted at length and was quoted directly in many particulars in the August 20, 1969 edition of THIS WEEK, a Rutherford County newspaper of general circulation. A copy of that story is attached to this judgment as Exhibit B.

The defendant, when confronted next day with the August 18, 1969 news story, read it and confirmed to another Rutherford County motion picture exhibitor that the story was accurate in substance. The defendant at the first hearing on September 11, 1969 denied that the *headlines* on the stories were correct; but the headlines and the supporting stories were testified to by the news people who wrote them and by others, and the defendant did not thereafter in the second hearing make any denial of the direct quotations attributed to him. The court finds the news stories and headlines to be correct in substance.

On August 20, 1969, Sheriff Huskey announced over the radio that he had closed the Midway Drive In Theatre for showing obscene films.

The defendant, also without having reviewed the film, informed J. W. Griffin, a theatre owner, that if Griffin showed the film "Where Eagles Dare" he would confiscate the film and arrest the owner.

The defendant also through threat of prosecution prevented the showing of the film "Candy" at the Tri-City Drive In and produced a temporary suspension of that theatre for two days.

As a result of the defendant's threats the plaintiff discontinued showing films with the labels "M", "R" and "X". and has not shown them since August 20, 1969. The evidence is that faced with a steady diet of "G" movies, customers

have stayed away in large numbers and that the plaintiff's business has suffered and that the effect of the ban will be to put the plaintiff out of business and cause a serious economic loss to its owners. The plaintiff has shown that the defendant's actions, if unjustified, cause and have caused irreparable harm to the plaintiff and that the plaintiff's remedy at law is inadequate.

There is no evidence before this court to determine whether any movie shown by any exhibitor or classified by any of the offending labels is or is not within the category of "obscene," nor whether any of the movies if shown for pay would violate the statutes of North Carolina. However, this court is not trying an obscenity case; prosecution for obscenity is a state matter. This court is hearing simply a question whether the actions of the Sheriff violate the constitutional guaranties of free speech and freedom of the press under the circumstances herein shown.

■ Motion pictures, including those displayed commercially, are a type of speech or expression the display of which is protected by the First and Fourteenth Amendments. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501–502, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

■ Obscenity is not protected by the First Amendment. Although obscenity is a form of speech or expression, a majority of the Supreme Court have thus far been consistent in holding that if speech or expression is obscene it is a proper subject of governmental regulation. States can still make obscenity unlawful. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (4th Cir., 1969).

■ Serious problems are presented by the procedures through which alleged obscenity may be apprehended and its purveyors prosecuted. As far as the seizure of allegedly obscene film is concerned, it is now clear that law enforcement authorities may not lawfully seize offending film without first conducting an adversary hearing *with the burden on the prosecution*, at which an opportunity is afforded the defendant to test the question of obscenity in a preliminary way before a judicial officer. The proceedings must be "designed to focus searchingly on the question of obscenity." Marcus v. Search Warrants, 367 U.S. 717, 732, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961). The adversary hearing must be conducted *before* the issuance of the warrant. A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964).

■ The actions of the defendant in this case raise a deeper question—the question of advance censorship or prior restraint on the display of film alleged to be obscene. Where the prior restraint is a physical seizure it is clearly unlawful. A Quantity of Copies of Books v. Kansas, *supra*. Where the restraint requires a license from a censor who may suppress a picture found to be "sacrilegious" it has been held to violate the constitutional protection. Joseph Burstyn, Inc. v. Wilson, *supra*, 343 U.S. at page 503, 72 S.Ct. 777. " * * * [S]uch a previous restraint is a form of infringement upon freedom of expression to be especially condemned." A heavy burden rests upon the state to demonstrate that the circumstances allow an exception to this principle. Burstyn v. Wilson, *supra*, 343 U.S. at page 504, 72 S.Ct. at 781. However, in a five to four vote the Supreme Court held in Times Film Corp. v. Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), that Chicago could by ordinance validly require exhibitors to submit for examination a copy of any film proposed to be run in Chicago. The *Times Film Corp.* holding is narrow; it did not abrogate any of the requirements of adversary hearing before prosecution has begun; and it does not appear to have involved any serious evidence that the ordinance itself had any particular "chilling" or inhibiting effects upon the conduct of the exhibitors.

When the advance censorship question came back before the Court they held in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), that a state censorship procedure was invalid because it allowed a censorship decision without a previous adversary hearing and because it failed to place upon the censor the burden of proving that the film was unprotected by the Constitution.

The *Freedman* case also enunciated the principle that in order for censorship to be valid, the exhibitor must be assured:

"* * * by statute or authoritative judicial construction, that the censor will, *within a specified brief period,* either issue a license or go to court to restrain showing the film. Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution. Moreover, we are well aware that, even after expiration of a temporary restraint, an administrative refusal to license, signifying the censor's view that the film is unprotected, may have a discouraging effect on the exhibitor. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584, *supra.* Therefore, the procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license.

"Without these safeguards, it may prove too burdensome to seek review of the censor's determination." (pp. 58–59, 85 S.Ct. at p. 739)

The Court went on to say:

"How or whether Maryland is to incorporate the required procedural safeguards in the statutory scheme, is, of course, for the State to decide. But a model is not lacking: In Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469, we upheld a New York injunctive procedure designed to prevent the sale of obscene books. That procedure postpones any restraint against sale until a judicial determination of obscenity following notice and an adversary hearing. The statute provides for a hearing one day after joinder of issue; the judge must hand down his decision within two days after termination of the hearing. The New York procedure operates without prior submission to a censor, but *the chilling effect of a censorship order,* even one which requires judicial action for its enforcement, suggests all the more reason for expeditious determination of the question whether a particular film is constitutionally protected." (p. 60, 85 S.Ct. at p. 740) (Emphasis added.)

In Teitel Film Corp. et al. v. Cusack et al., 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968), the Court held invalid the Chicago motion picture censorship ordinance because it did not comply with the requirements set out in Freedman v. Maryland, *supra.*

The censorship decisions cited above are not directly in point on their exact facts, but they are clear guides in their establishment of a constitutional requirement that there be no suppression or "chilling" of rights of speech and expression without (1) a prior adversary hearing on the obscenity of such matter conducted (2) with great dispatch and (3) with the burden being upon the state.

■ It is by this time abundantly clear that state action which chills or suppresses exercise of rights of speech and expression protected by the First and Fourteenth Amendments should be restrained by courts if the alternative remedy, pursuit of defense and appeal in the state courts, is not reasonably calculated to provide relief. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Cameron v. Johnson, 381 U.S. 741, 85 S.Ct. 1751, 14 L. Ed.2d 715 (1965), 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968).

■■ Every law enforcement officer has the right and the duty to prosecute those who violate the criminal law. If the conduct of the defendant were in fact restricted to the pious utterances which he admitted on the witness stand, his published statements would be nothing more harmful than a routine call for "law and order" in Rutherford County. The court, however, finds his conduct to have been thus limited and restricted neither by statute nor by any restraint of his own. His statements that he would seize or prosecute the exhibitors of all "adult" films or films labeled "R" and "X" were statements of prejudgment based on a letter code devised in Hollywood or New York *for material which Sheriff Huskey had never seen*! Probable cause for violation of North Carolina obscenity statutes is a judicial determination which can not be delegated to the motion picture distributors association nor to the film producers nor to studio officials. It is an individual determination which has to be made *film by film* on a local level *after* an adversary hearing, if convictions are to flow therefrom.

■ The chilling effect of the defendant's utterances upon the plaintiff's freedom and pocketbook are fully and dramatically demonstrated by the evidence. The prior restraint which his utterances produced is unquestionable. The unconstitutionality of that restraint is demonstrated.

It is therefore ordered that the defendant be, and he hereby is enjoined, pending further orders of court, from issuing or enforcing any past or future "ban" or statement or proclamation or remark in prejudgment as to what film or films or types of labels of films are going to be considered unlawful and subject to prosecution. It is further ordered that if any prosecution take place, it be preceded by an adversary hearing with full notice to the defendant and with full observance of the requirements as to burden of proof, notice and opportunity to be heard and judicial determination before issuance of a warrant, all as required in the decisions of the Supreme Court of the United States and the Circuit Court of Appeals, including the decisions herein referred to.

This is not a decision on the obscenity or "purity" of any film that may have been mentioned in the evidence nor in the exchange of views between the defendant and the motion picture people. This is simply a determination that the rights of the plaintiff and others similarly situated have been violated by the public statements and actions of the defendant and that those rights must be observed in the future.

## APPENDIX

### After Court Judgment . . .

# Sheriff Bans All Adult Movies

Adult movies and any type movies with a questionable rating have been indefinitely banned by Rutherford County Sheriff Damon Huskey, effective Saturday. The ban arose out of a Rutherford County Superior Court judgment over the June 19 confiscation of films at the Midway Drive-In at Sandy Mush. The three cans of films taken by the sheriff included "Ramrodder" and "Piece of Her Action."

The Superior Court heard the case in which Susan Dantzic was facing four charges which included the exhibition of obscene movies for gain, exhibition of obscene movies to minors, contributing to the delinquency of minors, and interference with an officer who was executing his duties.

In the Saturday session of court, the defendant, through her attorney tendered a plea of guilty to the first charge, exhibition of obscene movies for gain.

On the charge, she was fined $1,000, and sentenced to six months in jail, suspended three years on conditions that included not showing any obscene or even questionable movies at the Midway Drive-In. The ruling also included any movies that carry a rating for adults only, or mature audiences.

The Sheriff then put into effect an indefinite ruling to go on houses and theaters refrain from showing any of the adult or mature rating movies.

It was also reported that the Federal Charges lodged against the Sheriff for violation of Mrs. Dantzic's civil rights have been dropped.

**Exhibit A**

FOREST CITY, N.C., WEDNESDAY, AUGUST 20, 1969

## At Least One Theatre Owner To Resist

# Sheriff Proclaims All "Adult" Films Obscene; Imposes Ban

Proclaiming "we've got to have a stopping place somewhere," Sheriff Damon Huskey this week placed a ban on all "adult" rated movies in Rutherford County, but he has encountered resistance from at least a theatre owner.

Huskey issued his proclamation after a Superior Court judgement involving a June 19 arrest of a local theatre owner for showing "obscene" films.

The sheriff said yesterday that he was henceforth banning all films labeled as "adult," including those with the voluntary movie code ratings "R" and "X".

The "R" rating means a movie is simply restricted. The "X" means no one under 18 is to be admitted.

J.W. Griffin owner of the Griffin Theatre in Forest City, said Huskey met with him Tuesday morning and told him not to show the movie scheduled for that night, "Where Eagles Dare," an "M" rated film.

Griffin said he would show the film as scheduled. He said Huskey told him he would visit the theatre to view the film and if he felt it was obscene would close it.

Griffin said he would not voluntarily close the theatre.

The sheriff did not go to the Griffin Tuesday night. He said later that he had sent a deputy who viewed the film and said it was "just bloody."

"I'm after these sex films," the sheriff said, "and this was not one of them."

Huskey said he had another film stopped here Sunday night. He said he requested that the Tri-City Drive-In Theatre not show the scheduled film, "Candy," and that the management complied with the request and did not show the film.

Huskey said he planned to "stop all adult rated films unless they stop themselves" in theatres across the county as of this past Saturday. The ban is apparently in affect until the courts, or someone, declares otherwise.

"We've got to have a stopping place somewhere," said the sheriff. "The morals are getting so low... and we're just letting things go. The adults are just standing by..."

"These movies rated X and R are obscene," he said. "They're obscene even in their advertising."

Huskey said he had the authority through statute to make the ban. He also said recent Supreme Court decisions, which opened the doors for the recent flood of sexually-explicit movies, meant that "you can show this stuff in your homes, but these people are charging admission and showing it out in public."

Saturday's court decision was a victory for Huskey in an obscenity case which had been boiling for two months.

On June 19 Huskey raided the Midway Drive-In in Sandy Mush, and confiscated two films, "The Ramrodder" and "A Piece of Her Action," and charged the owner, Mrs. Susan Dantzic, and the 16-year-old projectionist, Miles Gunnin, with showing obscene films and contributing to the delinquency of minors.

They were found guilty in District Court and appealed the case to Superior Court.

In the Saturday session of court, the defendant, through her attorney entered a plea of guilty to the first charge, exhibition of obscene movies for gain.

On the charge, she was fined, $1,000, and sentenced to six months in jail, suspended three years on conditions that included not showing any obscene or even questionable movies at the Midway Drive-In. The ruling also included any movies that carry a rating for adults only, or mature audiences.

The sheriff also said that a complaint filed against him in Federal Court by Mrs. Dantzic would be non-suited. The films taken in the Midway raid have been sent, by an attorney, to the film company in Charlotte.

**Exhibit B**

[A145]