THE STATE OF OHIO, APPELLEE, *v.* ALBINI, APPELLANT.
CITY OF COLUMBUS, APPELLEE, *v.* SURIANO ET AL.,
APPELLANTS.

(Nos. 71-736 and 71-737—Decided July 5, 1972.)

28

*Mr. James J. Hughes*, city attorney, *Mr. Carl T. Wolfrom* and *Mr. Daniel W. Johnson*, for appellees.
*Mr. James R. Willis*, for appellants.

HERBERT, J.   This case does not involve the seizure of alleged contraband.

Appellants are unable to produce any decision of the United States Supreme Court which requires us to hold that "police officers may not, consistent with the First and Fourteenth Amendments, make a unilateral determination, after viewing a particular motion picture film, that it is obscene and then proceed without a warrant to arrest the exhibitor and seize the film."[1]  The adoption of appellant Albini's contention in this regard would emasculate the efforts of the General Assembly to discourage those who would profiteer through the commercial exploitation of sex by publicly exhibiting motion picture film, the dominant theme of which appeals to a prurient interest in sex.[2]

---

[1] Appellant Albini's first proposition of law.

[2] Essentially, it appears to be the contention of counsel for appellants that two trials, each with a full right of appeal, are required for final conviction of an offense of this nature, regardless of whether the facts would otherwise constitute obvious proof of guilt; first, a hearing to determine whether the officer may be permitted to make an arrest, file charges and take physical custody of the obscene material for evidentiary purposes and, second, the criminal trial itself.  In response to a question posed during oral argument of this cause, appellant's counsel estimated that a final adjudication of the first hearing in cases such as the ones at bar would require at least two years. Moreover, just how the physical evidence could be adduced at this first hearing without prior "seizure" thereof is not clear since we cannot assume that a potential criminal defendant would freely volunteer to supply such.

We are not unmindful of the decisions of the Supreme Court in *Marcus* v. *Search Warrant* (1961), 367 U. S. 717; *A Quantity of Books* v. *Kansas* (1964), 378 U. S. 205; and *Freedman* v. *Maryland* (1965), 380 U. S. 51, wherein certain procedures which did not adequately safeguard against the suppression of nonobscene material were invalidated. We are also cognizant of the fact that the Third, Fourth and Seventh Circuit Courts of Appeals in *Cambist Films* v. *Duggan* (1969), 420 F. 2d 687; *Tyrone, Inc.*, v. *Wilkinson* (1969), 410 F. 2d 639; and *Metzger* v. *Pearcy* (1968), 393 F. 2d 202, appear to conclude that one or more of the above referenced United States Supreme Court decisions command a prior judicial sanction of some kind in situations factually similar to the one presented here. It is our conclusion, however, that those Circuit Court cases represent unwarranted extensions of the Supreme Court's holdings.

In *Marcus* v. *Search Warrant, supra*, approximately 11,000 copies of 280 publications, principally magazines, but also some books and photographs, were seized at six different locations on the authority of a search warrant that authorized the examination, by day or night, of a stock of magazines which ran into " 'hundreds of thousands * * * [p]robably closer to a million copies.' " *Marcus*, at page 722. In *A Quantity of Books* v. *Kansas, supra*, 1,715 copies of 31 novels were seized and held for destruction pursuant to a warrant which authorized the seizure of all copies of 59 different novels, and which was originally granted upon the basis of a 45-minute *ex parte* inquiry conducted by a judge who "scrutinized" seven of the books during that time and stated that they "appear to be obscene literature as defined," thus giving him "reasonable grounds" to believe that the rest fell within the same category.

*Freedman* v. *Maryland, supra* (380 U. S. 51), involved a censorship board and the unique problems attendant therewith. Under the Maryland statute, for instance, " * * * once the censor disapproves the film, the exhibitor must assume the burden of instituting judicial proceedings and of persuading the courts that the film is protected expression. Second, once the board has acted against

a film, exhibition is prohibited pending judicial review, however protracted. Under the statute, appellant could have been convicted if he had shown the film after unsuccessfully seeking a license, even though no court had ever ruled on the obscenity of the film. Third, it is abundantly clear that the Maryland statute provides no assurance of prompt judicial determination." *Freedman*, at pages 59 and 60.

Upon that basis, the court found that, "the Maryland scheme fails to provide adequate safeguards against *undue* inhibition of protected expression * * *." (Emphasis added.)

We agree that there must be procedural safeguards imposed to obviate the dangers inherent in any scheme which allows prior restraint upon, or the indiscriminate and unlimited seizure of, allegedly obscene material. However, we do not read the above cited Supreme Court decisions as demanding that in every case where a seizure of alleged obscene material is to be made, a preseizure adversary hearing is constitutionally required.[3] Whether or not such a hearing is necessary must depend upon the nature and purpose of the seizure.

In each of the instant cases, a single copy of a particular film was seized for the sole purpose of preserving it as evidence to be used in a criminal prosecution. In our opinion, "such a seizure cannot be said to be violative of the First Amendment's guarantees albeit a side effect of such a seizure coincidentally prevents that one particular copy of the film from being further disseminated pending

---

[3]See, *Milky Way Productions* v. *Leary*, 305 F. Supp. 288 (S. D. N. Y. 1969). While that case dealt with an arrest only and not an arrest and seizure, it is significant that the three-judge panel there found that, (1) there need not be an adversary hearing before an arrest for obscenity and, (2) that *A Quantity of Books* v. *Kansas* and *Marcus* v. *Search Warrant* were "* * * decisions which have condemned *mass,* or *broadly effective,* seizures of allegedly obscene writings * * *." (Emphasis added.) *Milky Way Productions* v. *Leary*, at page 296.

The Supreme Court of the United States affirmed the *Milky Way* decision in *New York Feed Co.* v. *Leary* (1970), 397 U. S. 98.

the outcome of the criminal proceedings. * * *" *Bazzell* v. *Gibbens* (1969), 306 F. Supp. 1057, 1059.

We also note that in the Circuit Court decisions of *Metzger* v. *Pearcy* and *Tyrone* v. *Wilkinson, supra,* which enjoined the mass seizure of *all* the disputed films in those cases as contrary to the Supreme Court holdings, specific provision was made by the court in each instance for one copy of the movies to be given to the state's attorney for "use in the preparation and trial of the charges now pending * * *." *Tyrone,* at page 641.

The seizures now before us were not made for the purpose of preventing the dissemination of that which the film contained. Quite the contrary, the single copies were taken for the purpose of preserving them in order that they might be used as evidence in proceedings to determine whether their exhibitors were guilty of committing a crime. As the court below held:

"The seizure of evidence without a warrant, following a lawful search as an incident to a lawful arrest, is a strictly limited right. It arises from the inherent necessities of the situation at the time of the arrest. Its primary purpose must be to prevent the concealment or destruction of evidence of the crime for which the arrest was made. See *Chimel* v. *California* (1969), 395 U. S. 752. The seizure here involved was reasonably designed to effect that purpose. The evidence (films) seized was used as a means of the commission of the crime for which the arrest was made. Were the evidence anything other than motion picture films or some other means of expression, there could be no doubt but that the seizure did not violate any constitutional right of the defendant."

Appellants also argue that *Stanley* v. *Georgia* (1969), 394 U. S. 557, which extended the First and Fourteenth Amendments to "prohibit making mere private possession of obscene material a crime" (page 568), also prohibits making the public exhibition of an admittedly obscene film a crime so long as "the viewing public has been sufficiently advised as to the possible offensiveness thereof, and the

film is not advertised in a pandering way.'"⁴ In support of that proposition, they cite *Karalexis* v. *Byrne* (1969), 306 F. Supp. 1363, 1367 (reversed and remanded, *Byrne* v. *Karalexis* [1971], 401 U. S. 216, 27 L. Ed. 2d 792), where Judge Aldrich of the United States District Court for Massachusetts stated, at page 1367:

"If a rich Stanley can view a film, or read a book, in his home, a poorer Stanley should be free to visit a protected theater or library."

As of the writing of this opinion, the Supreme Court of the United States has not adopted Judge Aldrich's views regarding the constitutional entitlements of obscenity.⁵

*Stanley* v. *Georgia, supra*, clearly does not extend constitutional protection to public exhibitions of obscene material:

"* * * *Roth* and the cases following that decision are not impaired by today's holding. As we have said, the states retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual in the privacy of his own home." *Stanley* v. *Georgia, supra*, at page 568.

The decisions of the Court of Appeals are affirmed and the causes are remanded for execution of sentences.

*Judgments affirmed.*

O'NEILL, C. J., CORRIGAN, STERN and LEACH, JJ., concur. SCHNEIDER, J., concurs in the syllabus and judgment. BROWN, J., dissents.

BROWN, J., dissenting. Contrary to the approach taken by the majority in these cases, searches and seizures in connection with allegedly obscene material are not governed by the standards controlling searches and seizures with respect to narcotics, gambling paraphernalia, and other such contraband. *Marcus* v. *Search Warrant* (1961), 367 U. S. 717; *A Quantity of Books* v. *Kansas* (1964), 378

⁴Appellants' second, and final, proposition of law.
⁵See *United States* v. *Reidel* (1971), 402 U. S. 351, 28 L. Ed. 2d 813.

U. S. 205; and *Freedman* v. *Maryland* (1965), 380 U. S. 51; 5 A. L. R. 3d 1214, 1225.

As held by the majority of cases considering this issue, the possessor of materials seized as being allegedly obscene is entitled to an adversary hearing on the issue of obscenity *before* his material can be classified and treated as contraband. See *Leslie Tobin Imports* v. *Rizzo* (1969), 305 F. Supp. 1135; *Merritt* v. *Lewis* (1970), 309 F. Supp. 1249· *Newman* v. *Conover* (1970), 313 F. Supp. 623; *People* v *Kozak* (1968), 56 Misc. 2d 337, 288 N. Y. Supp. 2d 692· *Metzger* v. *Pearcy* (1968), 393 F. 2d 202; *Cambist Films* v *Tribell* (1968), 293 F. Supp. 407; *Tyrone* v. *Wilkinson* (1969), 294 F. Supp. 1330, affirmed 410 F. 2d 639; *Wilhelm* v. *Turner* (1969), 298 F. Supp. 1335, affirmed 431 F. 2d 177; *Gregory* v. *Diflorio* (1969), 298 F. Supp. 1360; *Carter* v. *Gautier* (1969), 305 F. Supp. 1098; *Delta Book Distributors* v. *Cronvich* (1969), 304 F. Supp. 662; *Miske* v. *Spicola* (1969), 314 F. Supp. 962; *Engstrom* v. *Robinson* (1970) 317 F. Supp. 124; *Felton* v. *Pensacola* (Fla. 1967), 200 So 2d 842; *People* v. *Rothenberg* (1967), 20 N. Y. 2d 35, 228 N. E. 2d 379; *People* v. *Hughes* (1969), 31 App. Div. 2d 235, 296 N. Y. Supp. 2d 671; *Aday* v. *Municipal Court* (1962), 210 Cal. App. 2d 229, 26 Cal. Rptr. 576. See, also, *Jodbor Cinema, Ltd.*, v. *Sedita* (1970), 309 F. Supp. 868, where it was held that the seizure of an allegedly obscene motion picture film without a prior adversary hearing on the issue of obscenity was improper, even though, before issuance of the warrant for such seizure, the judge had personally viewed the film at the theater. And in *A Quantity of Books* v. *Kansas, supra* (378 U. S. 205), a state's seizure of allegedly obscene books, where there was no prior adversary determination of their obscenity, was held to be unconstitutional.

While police officers are properly trained and qualified experts in the detection and proper identification of the usual paraphernalia of crime, they do not enjoy such a status with respect to the determination of the obscenity of literature and movies—a determination which, under *Roth* v. *United States* (1957), 354 U. S. 476, involves a subtle

and all encompassing evaluation of the literary and artistic merits as compared with contemporary community standards. Determination by police officers of the status of suspected books and papers and movies as obscene is not enough protection to the owner or possessor of the material so as to comport with due process of law. See 5 A. L. R. 3d 1214, 1225. The holding of the majority today constitutes an unlawful delegation to the police of the plenary duty of the courts to so determine whether there is probable cause to believe the films obscene after all parties have had an opportunity to express and present to the best of their ability the *Roth* considerations.

Although the seizure of the films in question was incident to an arrest, *the arrest itself*—and hence the seizure —is invalid. In the absence of a prior judicial hearing to determine *probable cause* to believe the films obscene, the arrest is the product of the unlawful delegation of authority.

The majority has stated that:

"The seizures now before us were not made for the purpose of preventing the dissemination of that which the film contained. Quite the contrary, the single copies were taken for the purpose of preserving them in order that they might be used as evidence in proceedings to determine whether their exhibitors were guilty of committing a crime."

In so limiting the holding of this case to the seizure of single copies of allegedly obscene films, the majority has apparently sought to align themselves with those decisions dealing with the limited evidentiary seizure of books and other materials. Such limited confiscation has been held to be reasonable accommodation of the constitutional right of speech, in that it authorizes a restricted method reasonably calculated to insure against total curtailment of constitutionally protected expression, so as not to create a "chilling effect." In addition to the cases cited by the majority for this proposition, see *People* v. *DeRenzy* (1969), 275 Cal. App. 2d 380, 79 Cal. Rptr. 777; *Rage Books* v.

*Leary* (1969), 301 F. Supp. 546; *Overstock Book Co.* v. *Barry* (1969), 305 F. Supp. 842.

Such an approach may be valid with regard to the seizure of books, magazines and other printed materials where the owner typically carries a large inventory of each different publication. In such case, seizure by the police of a few samples does not amount to an unconstitutional suppression of materials in violation of the First Amendment.

However, when dealing with a movie theater the seizure of even a single copy of a film may—and probably does—constitute a confiscation of the entire ''inventory,'' with result of an *absolute* suppression of the film. Even if a movie operator were to obtain and keep on the premises two copies of every film (an unreasonable burden in and of itself), after seizure of the initial copy by the police incident to the arrest of the movie operator, the operator would perhaps then be subject to a second (unlawful) arrest and seizure for exhibiting the second film, as a separate violation of R. C. 2905.34 (now R. C. 2905.35). The ultimate result is the same, either under the ''one film seizure rule'' adopted by this court, or a ''five film'' or ''one hundred film''—or a ''thousand film''—seizure rule; and, potential audiences of consenting adults are to be denied access to movies that are only deemed obscene by one or more police officers who may or may not properly apply the *Roth* test in the determination of whether there is probable cause that the movie is obscene, and the arrest justified.[6]

---

[6]It should be noted that the United States Supreme Court itself has granted certiorari in two cases which will hopefully establish whether the requirement of a pre-seizure adversary hearing is or is not an "unwarranted extension of the Supreme Court's holdings," as contended by the majority of this court. See Crim. Law Rep., April 26, 1972, and May 17, 1972, wherein the Supreme Court is stated to have granted certiorari in *Roaden* v. *Kentucky*, No. 71-1134, and *Heller* v. *New York*, No. 71-1043, respectively.