**UNITED ARTISTS THEATRE CIRCUIT, INC., Plaintiff,**

**v.**

**William Powell THOMPSON, Prosecuting Attorney of Sebastian County, State of Arkansas,**

**and**

**Jim Tittle, Sheriff of Sebastian County, State of Arkansas, Defendants.**

**Civ. A. No. FS–70–C–49.**

United States District Court,
W. D. Arkansas,
Fort Smith Division.

Aug. 3, 1970.

Bryan & Fitzhugh, Fort Smith, Ark., George Potts, Golden, Burrow, Potts & Boeckman, Dallas, Tex., Peter D. McKenna, Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff.

William Powell Thompson, Fort Smith, Ark., Joe Purcell, Benton, Ark., and Mike Wilson, Little Rock, Ark., for defendants.

Before MEHAFFY, Circuit Judge and HARRIS and WILLIAMS, District Judges.

## MEMORANDUM OPINION

PER CURIAM.

On June 5, 1970, three local ministers attended the Minitek Theater at Fort Smith, Arkansas and viewed the showing of the film entitled "The Libertine." They conferred with Honorable Paul Wolfe, Circuit Judge of Arkansas, Judicial Circuit No. 12, and told him what they had seen and that in their opinion it was an obscene film. Judge Wolfe received their written affidavits in addition to their oral report and directed local police officers to view the film, which they did. They reported to Judge Wolfe that in their opinion the film was obscene. Judge Wolfe then issued a search warrant for the film. The officers who served the warrant attended the theater, viewed part of the film as it was being shown to a paid audience, and took the film into their possession under the search warrant, and also as evidence seized in connection with an offense committed in their presence.

The plaintiff, United Artists, owner and operator of the Minitek Theater in Fort Smith, Arkansas, on the 10th day of June 1970 filed a motion asking that a Three Judge Court be convened; that the search and seizure be declared void

in violation of the United States Constitution; that defendants be ordered to return the seized film; for an injunction against State prosecution in connection with the public showing of "The Libertine;" that Act 411 of 1967 of Acts of Arkansas be declared unconstitutional; and for other relief.

On the 19th day of June 1970 the Grand Jury of Sebastian County, Arkansas, returned an indictment against the plaintiff United Artists for knowingly circulating or causing to be circulated an obscene film in violation of Act 411 of 1967.

■ The Grand Jury at the same time also returned an indictment against Terrell Joyner, an individual, on a separate charge. The Court set July 10, 1970 to hear the pending motions. At the hearing on July 10th plaintiff moved for permission to file an amendment to the complaint and also to permit Terrell Joyner, manager of the Minitek Twin Theatre (who was indicted by the Grand Jury on June 19, 1970) and Audubon Films, Inc., a New York corporation (owner of the distribution rights in the film) to intervene. These motions were denied. They were not timely made. The issues between plaintiff and defendant were already joined. Attorneys for plaintiff and defendant had filed and the Court had considered exhaustive briefs as to the existing issues. Additionally, interventions and/or amendment at this time would possibly change the nature of the action. Furthermore, denial of the motions in no way prejudices the rights of parties to bring a separate suit if they or any of them so desire.

The affidavit of Judge Wolfe was received in evidence. (See Appendix)

After argument of counsel the pending motions were submitted to the Court.

The Court hereby finds that it has jurisdiction of the parties and subject matter as hereinafter set out:

■ A three-judge court is proper under 28 U.S.C. Section 2281 since there is an attack on the constitutionality of the Arkansas statute which is not "plain-ly insubstantial" or "obviously without merit."

28 U.S.C. § 2281 provides:

*"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute* by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under state statutes, *shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges* under section 2284 of this title." (Emphasis added.)

See Grove Press, Inc. v. City of Philadelphia, 300 F.Supp. 281 (E.D.Pa.1969) aff'd 418 F.2d 82 (C.A.3, 1969); Ex Parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152; Bailey v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1968); Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1968); Swift & Co. v. Wickham, 382 U.S. 111, 120, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).

■■ The defendants frankly admit that there has been no adversary hearing on the question of obscenity. The Court finds that the inquiry made by the Honorable Paul Wolfe, Circuit Judge did not constitute an adversary hearing—that the warrant was issued and the film was seized without an adversary hearing —that the United States Constitution as construed by the courts of the United States requires an adversary hearing prior to the issuance of a warrant or the seizure of a film alleged to be obscene; therefore the film must be ordered returned to the plaintiff.

In the recent case of United States v. Alexander, 428 F.2d 1169 (8th Cir. May 22, 1970) the Eighth Circuit held that the requirement in A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S. Ct. 1723, 12 L.Ed.2d 809 (1964) that an adversary hearing must be held on

the question of obscenity, prior to the issuance of a warrant authorizing the seizure of books, also applied to the seizure of films. This opinion further noted that the Second, Fourth and Seventh Circuits have reached the same conclusion.

In Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969), the judge who issued the warrant under which the film was seized had seen the film himself, but the court held that an adversary hearing was still required. The Second Circuit noted that it was not called upon to decide whether the film was in fact obscene but merely whether the First amendment required that appellees be given an opportunity to be heard on the issue of obscenity before the film was seized by the police. It held that the First amendment, as applied to the states by the Fourteenth, requires an adversary hearing in such a case.

See also Metzger v. Pearcy, 393 F.2d 202 (7th Cir. 1968); Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (4th Cir. 1969); Wilhelm v. Turner, 431 F.2d 177 (8th Cir. 1970).

We are asked to declare Act 411 of 1967 unconstitutional and to enjoin the State of Arkansas and its officials from prosecuting plaintiff.

The Court finds that as to the plaintiff, and for the purpose of this case, Act 411 of 1967 is not unconstitutional, and we will not presume that it will be enforced in an unconstitutional manner. Similar statutes have been held constitutional in the following cases:

Entertainment Ventures, Inc. v. Brewer, 306 F.Supp. 802 (M.D.Ala.1969); Delta Book Distributors, Inc. v. Cronvich, 304 F.Supp. 662, 668 (E.D.La. 1969); Cambist Films, Inc. v. Tribell, 293 F.Supp. 407 (E.D.Ky.1968.)

The Court further finds that no injunction should issue from this court to the officials of the State of Arkansas.

28 U.S.C. § 2283 reads as follows:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

In the case of Atlantic Coast Line Railroad Company, Petitioner, v. Brotherhood of Locomotive Engineers, et al., 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (June 8, 1970) Justice Black stated:

" * * * When this Nation was established by the Constitution, each State surrendered only a part of its sovereign power to the national government. But those powers that were not surrendered were retained by the States and unless a State was restrained by 'the supreme Law of the Land' as expressed in the Constitution, laws or treaties of the United States, it was free to exercise those retained powers as it saw fit. One of the reserved powers was the maintenance of state judicial systems for the decision of legal controversies. Many of the Framers of the Constitution felt that separate federal courts were unnecessary and that the state courts could be entrusted to protect both state and federal rights. Others felt that a complete system of federal courts to take care of federal legal problems should be provided for in the Constitution itself. This dispute resulted in compromise. One 'supreme Court' was created by the Constitution, and Congress was given the power to create other federal courts. In the first Congress this power was exercised and a system of federal trial and appellate courts with limited jurisdiction was created by the Judiciary Act of 1789, 1 Stat. 73.

While the lower federal courts were given certain powers in the 1789 Act, they were not given any power to review directly cases from state courts, and they have not been given such powers since that time. Only the Supreme Court was authorized to review on direct appeal the decisions of state courts. Thus from the beginning we have had in this country two essentially separate legal systems. Each system proceeds independently from the other with ultimate review in this

Court of the federal questions raised in either system. Understandably this dual court system was bound to lead to conflicts and frictions. Litigants who foresaw the possibility of more favorable treatment in one or the other system would predictably hasten to invoke the powers of whichever court it was believed would present the best chance of success. Obviously this dual system could not function if state and federal courts were free to fight each other for control of a particular case. Thus, in order to make the dual system work and 'to prevent needless friction between state and federal courts,' Oklahoma Packing Co. v. Oklahoma Gas & Electric Co., 309 U.S. 4, 9, 60 S.Ct. 215, 218, 84 L.Ed. 537 (1940), it was necessary to work out lines of demarcation between the two systems. Some of these limits were spelled out in the 1789 Act. Others have been added by later statutes as well as judicial decisions. The 1793 anti-injunction Act was at least in part a response to these pressures.

On its face the present Act is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions. The respondent here has intimated that the Act only establishes a 'principle of comity,' not a binding rule on the power of the federal courts. The argument implies that in certain circumstances a federal court may enjoin state court proceedings even if that action cannot be justified by any of the three exceptions. We cannot accept any such contention. In 1954 when this Court interpreted this statute, it stated: 'This is not a statute conveying a broad general policy for appropriate *ad hoc* application. Legislative policy is here expressed in a clear-cut prohibition qualified only by specifically defined exceptions.' Amalgamated Clothing Workers v. Richman Brothers, 348 U.S. 511, 515–516, 75 S.Ct. 452, 455, 99 L.Ed. 600 (1955). Since that time Congress has not seen fit to amend the statute and we therefore adhere to that position and hold that any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be upheld. Moreover since the statutory prohibition against such injunctions in part rests on the fundamental constitutional independence of the States and their courts, the exceptions should not be enlarged by loose statutory construction. Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this Court."

That case is dispositive of the request for injunction, since we find that the present case is not within any of the statutory exceptions.

■ Although we order the seized film returned to the plaintiff, we direct the plaintiff to furnish to the defendant officers of the State of Arkansas a print of the film in question for the use of the State in pending prosecution concerning said film. In the recent *Alexander* case, supra, the court in ordering the return of the materials seized had this to say:

"However, we also adopt the teachings of the Seventh Circuit in Metzger v. Pearcy, 393 F.2d 202 (1968), and the Fourth Circuit in Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (1969), and hold that the order for return shall be without prejudice to the district court to compel appellants to deliver, on request of the United States Attorney for District of Minnesota, one copy of each of the titles described in the warrants for use in connection with any criminal prosecution initiated by the Government."

See also Carroll v. City of Orlando, 311 F.Supp. 967 (M.D.Fla.1970.)

Judgment will be entered in accordance with the foregoing opinion.

**820**

APPENDIX

AFFIDAVIT OF PAUL WOLFE

STATE OF ARKANSAS }
COUNTY OF SEBASTIAN }

Paul Wolfe being first duly sworn deposes and says:

My name is Paul Wolfe and I am Circuit Judge of the Twelfth Judicial Circuit (Sebastian County) of the State of Arkansas.

On June 5, 1970, at approximately 10:30 A.M., I conducted a hearing to determine whether there was probable cause for the issuance of a warrant of search and seizure for the movie film "The Libertine" as being obscene and in violation of the criminal laws of the State of Arkansas. Four persons who had seen the film on June 4, 1970, were placed under oath and testified at the hearing. The persons testifying were Charles Karr, Deputy Prosecuting Attorney of Sebastian County, and three Fort Smith ministers, Charles Skutt, James Griffin, and Edward Roush. The following is a summary of the testimony presented at the probable cause hearing.

The movie film "The Libertine" was shown in the City of Fort Smith on June 4, 1970, at the Minetek Twin Theatres, 1400 South "U" Street, Fort Smith, Arkansas. The movie was advertised in the local newspaper in an ad showing a young female dressed only in a pair of bikini panties and a brassiere. The only verbal description of the movie in the ad was that it made Hugh Hefner's Playboy Penthouse look like a nursery school. The movie was further advertised as being rated "X" and that no one under the age of 17 would be admitted— proof of age required.

The subject of the movie is sex perversion. The story begins with the death of the star's husband. Shortly after his death she learns that he was a sex pervert and following this discovery she purchases a book on sex perversion and reads from it throughout the film. As she reads from the book throughout the movie she engages in many of the sex acts as are described in the book. It is a continuum of different forms of sexual relationships with different men. This continues from the first ten minutes of the film right up until the final scene.

Within the first ten minutes of the movie there is a scene which displays the completely nude female body, with extended exposure of the bare breasts and vaginal area with pubic hair. Scenes of this type are prevalent throughout the film and continue right up to the end. Scenes exposing the bare breasts and vaginal areas appear throughout the film some ten or twelve times and are not limited to fleeting glimpses but remain on the screen for several seconds.

Early in the film there is a scene in which the nude female is supposedly being treated by a male posing as a physician. The nude female is on the examining table lying on her back with the male feeling her abdominal anatomy with his hands, at one point coming extremely close to the vaginal area. He then turns her over to a position in which she is lying on her stomach and then begins listening with his ear—first in the shoulder area and then moving slowly downward until he traverses her bare buttocks.

As the star reads from the book on sex perversion about sex relations of human beings with animals, she has a beetle (insect)—which is allowed to crawl around on her body. At one point in this scene her bare breast covers the entire screen and the small beetle crawls around on the nipple of the breast. This scene lasts for several seconds and concludes with her removing the beetle, holding it up and saying, "All you can do is tickle me".

Another of the star's relationships is that with a sadistic male who begins his sexual play by slapping her violently across the face and then forcibly ripping her clothes from her body. She is then thrown to the floor and the male begins caressing her in the area of the neck, then moving down caressing and mouthing the breasts then the rest of her torso, including the outer fringes of the vaginal

area. In this scene there is a complete exposure of pubic hair and the bare breasts.

The theme of the movie was limited to sex and provided a conduit for a continuous display of nude scenes and different forms of sexual relationships. The theme of the movie and its portrayal of the sex scenes is one which arouses human passions.

On June 4, 1970, at 6:00 P.M. showing of the movie, "The Libertine" there was a crowd of less than fifty persons. The audience at the 7:40 P.M. showing on the same date was larger but not greater than 200 persons. The makeup of these crowds was predominantly male with no more than 15% of the crowd being female.

From the above and foregoing testimony, I concluded that there was probable cause to believe that the film "The Libertine" was obscene in that to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest and that the following three elements coalesced in this regard: (1) the dominant theme of the material taken as a whole appeals to prurient interest in sex; (2) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and, (3) the material is utterly without redeeming social value, and that the film was being exhibited in the City of Fort Smith in violation of the criminal laws of the State of Arkansas. Following the procedure recognized in Lee Art Theatre Co., Inc. v. Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968), I issued a search warrant for the seizure of the film "The Libertine".

*Paul Wolfe*

---

Paul Wolfe

Subscribed and sworn to before me this 10th day of July, 1970.

*Louise Patton*

---

Notary Public

My Commission Expires:
Dec. 8, 1971