**UNITED STATES of America**

**v.**

**50 MAGAZINES, located on the premises known as 1 Pomfret Street, Providence, Rhode Island, being a certain three-story brick commercial building in the District of Rhode Island.**

**UNITED STATES of America**

**v.**

**NINE (9) CARTONS OF PRINTED MAT- TER located on the premises known as 77 Coggeshall Street, Providence, Rhode Island.**

**Civ. A. Nos. 4411, 4507.**

United States District Court, D. Rhode Island.

Feb. 24, 1971.

Lincoln C. Almond, U. S. Atty., and Joseph C. Johnston, Jr., Asst. U. S. Atty., Providence, R. I., for plaintiff.

Leonard Kamaras, Providence, R. I., for defendants.

## OPINION

PETTINE, District Judge.

These cases rest upon a determination of the constitutionality of the procedures employed by petitioner in bringing the allegedly obscene magazines and books in question before this Court. The novelty of those procedures justifies their detailed consideration.

## FINDINGS OF FACT

### 50 MAGAZINES

On September 15, 1970, petitioner made application for a warrant to search the premises of Imperial Distributors, Inc., located at 1 Pomfret Street, Providence, Rhode Island, wherein the respondent 50 magazines were alleged to be located, and seize said magazines, together with all documents relating to their purchase. The magazines were specifically identified by title in the warrant.

An affidavit in support of the application was submitted by one Frank A. Allain, a postal inspector whose duties included investigation of obscene matter transmitted through the United States mails. The affidavit recited that Mr. Allain had been shown a parcel containing the 50 magazines named in the warrant, which parcel was addressed to Imperial Distributors and bore a return address of "Henry Roberts, Vendesgade 25, Copenhagen, Denmark." He stated therein that "the magazines consist mainly of pictures of nude men and women performing various sex acts, group sex acts, men performing homosexual sex acts, or poses of men and/or women which emphasize the genital areas."

Attached to the affidavit was an order blank bearing the return address of "Sct. Claus, Box 46, DK-2620, Albertsland, Denmark," and a circular containing illustrations from what appeared to be some 80 or more magazines and films offered by "Sct. Claus." The affidavit set forth the following connection between the respondent 50 magazines on the one hand and the order blank and circular on the other: 1) 4 of the magazines whose front page is featured in the circular are among the 50 in the parcel sent to Imperial Distributors; and 2) Mr. Allain's experience as a Postal Inspector gave him reason to believe that it was the usual practice for circulars to be sent out along with order forms by Danish and Swedish firms distributing magazines of this nature, and that shipment was made only following receipt of payment. He therefore asserted in the affidavit that he had reason to believe that a circular offering the 50 magazines here in question, as well as a cancelled check or money order receipt representing payment therefor, were located on the premises of Imperial Distributors.

Simultaneous with the application for the search warrant, petitioner filed a petition for an order to show cause why a seizure of the magazines recited in the search warrant should not be executed, the petition alleging that the magazines were delivered though the mails in violation of 18 U.S.C. § 1461,[1] and that they were subject to forfeiture both under 18 U.S.C. § 1465 [2] and 19 U.S.C. § 1305.[3]

[1.] This section provides in part as follows:
"§ 1461. Mailing obscene or crime-inciting matter.
Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance * * *
     *     *     *     *     *
Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.
Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both * * *"

[2.] This section provides:
"§ 1465. Transportation of obscene matters for sale or distribution.
Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution any obscene, lewd,

In support of these contentions, the petition alleged that a Customs Segregator, one John Skerry, had opened the package containing the magazines, had inspected them and had found them to contain " * * * photographs of men and women in various states of undress and performing various sexual acts, both homosexual and heterosexual."

Following an *ex parte* hearing at which the Court made it clear that it was authorizing merely a search of the premises of Imperial Distributors and not a seizure of the magazines, the Court signed the search warrant and granted the order to show cause, directed at the "distributors and sellers and all other persons interested in the sale or commercial distribution of the material as described." The search was conducted on September 15, 1970, during the course of which the package of 50 magazines was located, unopened, on the premises of Imperial Distributors. A further thorough search of the office turned up brochures and letters which Mr. Allain stated, in an affidavit of execution of the search warrant filed with this Court on September 21, 1970, relat-

ed to the purchase of the magazines here in question. Although the search apparently was conducted in literal compliance with this Court's authorization of a *search* warrant only, it appears that Mr. Allain conducted the search attendant with members of the City's police department who seized virtually everything else in the store other than these 50 magazines, leaving intact only that parcel.

On September 16, 1970, petitioner served a subpoena duces tecum upon "the duly authorized officer or agent of Imperial Distributors" (hereinafter, claimants), ordering him to testify before this Court and to bring with him the brochures and letters set forth in the affidavit of execution of the search warrant.

On September 21, 1970, the Court held a hearing upon the show cause order at which both petitioner and claimants were represented by counsel. At that time, the Court heard testimony upon claimants' contention that no probable cause existed for the search, and after full consideration of the facts of this

lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing * * * or any other matter of indecent or immoral character, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

The transportation as aforesaid of two or more copies of any publication or two or more of any article of the character described above, or a combined total of five such publications and articles, shall create a presumption that such publications or articles are intended for sale or distribution, but such presumption shall be rebuttable.

When any person is convicted of a violation of this Act, the court in its judgment of conviction may, in addition to the penalty prescribed, order the confiscation and disposal of such items described herein which were found in the possession or under the immediate control of such person at the time of his arrest."

3. "§ *1305. Immoral articles; prohibition of importation.*

(a) All persons are prohibited from importing into the United States from any foreign country * * * any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material. * * * No such articles whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles * * * shall be subject to seizure and forfeiture as hereinafter provided. * * * Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided. * * * Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed, and shall be destroyed. * * * "

case and of the applicable law, ruled that probable cause had, indeed, been demonstrated for the search. During the course of the hearing, the package containing 50 magazines, which claimants had brought with them pursuant to the subpoena, was marked for identification, but was never introduced into evidence by claimants. At that time this Court inquired of counsel how it was to make a determination of obscenity prior to seizure, if any, without the magazines being offered into evidence. Petitioner argued that since this was an *in rem* action, the magazine themselves were a party before this Court, and thus the Court could examine them without their formal introduction into evidence. Claimants evaded this *practical* aspect of the instant case. Neither party has offered any authority on this point, either at the hearing, or in briefs which they filed subsequently with this Court.

## 9 CARTONS OF BOOKS

The procedural devices employed in the earlier action were used as a model for instituting this suit. The following factual differences exist, however: in this case, the affidavit presented in support of a search warrant was that of an F.B.I. Agent, one John Sullivan. It stated that on Tuesday, January 12, 1971, he was informed by one John Wood, an Air Freight Supervisor for American Airlines, that nine cartons of books had arrived in Boston, having been shipped from Los Angeles and destined for a Providence addressee. The affidavit further stated that a carton was broken open during handling, bringing the contents to the attention of Mr. Wood, who at some subsequent time gave three books from the shipment to Agent Sullivan.

At the hearing upon the order to show cause, however, a substantially different picture of the events leading up to Agent Sullivan's obtaining the three items emerged. Mr. Wood testified that two cartons were damaged during shipment. On one carton, the two steel bands of the type which surrounded the other eight cartons were completely missing and the sealing tape had been split open, allowing the flaps of the box to be raised without resistance. A second carton was badly crushed, according to Mr. Wood, apparently in such a way as to similarly allow access to the contents. In neither damaged box were the contents exposed, and only by lifting the flaps of the cartons could one determine the contents thereof. Mr. Wood testified that the airline being liable for lost or damaged goods, he pulled open the flaps of the damaged cartons to determine whether they were full (there being further testimony that no bill of lading accompanied this shipment).

It further appeared from Mr. Wood's testimony that he made a cursory examination of one or two magazines in the damaged cartons, and since "everything he had read and heard about this type of material" alerted him to contact the F.B.I., he requested Agent Sullivan to come to the airport in order to look over this "pornography." Though there is conflicting testimony on this point, I credit Mr. Wood's initial recollection and find as a fact that, before the arrival of Agent Sullivan and another F.B.I. Agent, he resealed the damaged cartons and then reopened them after their arrival to remove the three specimen items. The testimony is uncontroverted that Agent Sullivan personally removed at least two of the three items, and as to the third it is not material to the issue herein who actually removed it, since I find as a fact from the conflicting testimony that the cartons were opened and material taken out of each in the presence of the F.B.I. Agent. I simply find unconvincing the testimony regarding a mysterious envelope in which Mr. Wood, acting entirely on his own, assertedly set aside one of the items here in question, before Agent Sullivan's arrival.

The 9 cartons contained about one hundred copies each of just three different publications, and the government agent took a single copy of each title.

The petition for an order to show cause alleged, as the sole jurisdictional

basis for this seizure, 18 U.S.C. § 1465, in that the books in question are "obscene, lewd, lascivious and filthy, and have been knowingly transported in interstate commerce."

A subpoena duces tecum was not issued in this case (apparently because Agent Sullivan already had in his possession a single copy of each title comprising the 9-carton shipment). At the hearing, the claimant voluntarily brought a single copy of each title, which by agreement was marked for identification as to its front cover only. Petitioner subsequently moved its introduction as a full exhibit.

It must be kept in mind that at this stage of these proceedings the Government has not instituted a criminal action against the claimants to either the 50 magazines or the 9 cartons of books, under either 18 U.S.C. § 1461 or 18 U.S.C. § 1465. At this time the Government appears to be moving for confiscation of the magazines under either 18 U.S.C. § 1465 or 19 U.S.C. § 1305 and for confiscation of the 9 cartons under the former statute. While criminal actions appear to be the undeniable ultimate objective of the United States, I find that certain substantive contentions of the claimants will be properly raised only in the eventuality of such future proceedings, and therefore I will not deal with them prematurely here—e. g., the argument that no violation of 18 U.S.C. § 1461 is made out on the facts of the case involving the 50 magazines; the argument that a Fifth Amendment violation has occurred here, in compelling claimants to introduce into evidence material which may tend to incriminate them; and the argument that the 50 magazines are inadmissible at trial because the seizure of the other materials on the premises of Imperial Distributors tainted the entire search. I do not reach those questions here and therefore intimate no resolution of the issue of the admissibility of the magazines or books in any subsequent proceeding.

The question before me now is a much narrower one—namely, do the procedures utilized in bringing these magazines and books before me for an adjudication of their obscenity vel non pass constitutional muster? I choose to begin this inquiry with a consideration of the two Supreme Court cases which are guideposts for application of the principle that any "seizure" of written matter must be preceded by an adversary hearing before a court.

## PRIOR ADVERSARY HEARING REQUIREMENT

In Marcus v. Search Warrants of Property, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961) (hereinafter *Marcus*) the Court reviewed a civil proceeding of the State of Missouri which authorized judges and magistrates to issue warrants for the search of named premises and the seizure of "obscene * * * publications" found there, upon a complaint stating in essence, that such publications were obscene. The statute provided for an adversary hearing within 20 days following the seizure, to determine whether the materials were in fact obscene, and if so determined, provided for their destruction. Some 11,000 copies of 280 publications, adjudged by the police to be obscene, were seized under the vaguely-worded warrants, less than half of which were later found by the judge who had issued the warrants to be obscene. Reiterating the holding of Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957) (hereinafter *Roth*), that "obscenity is not within the area of constitutionally protected speech or press," the Court nevertheless did not reach the question of whether all or even any of the seized publications were obscene. Instead it found the procedures did not satisfy Fourteenth Amendment due process requirements, by failing to adequately discriminate between constitutionally protected and unprotected expression.[4] In particular, the Court em-

4. This is an application of the incorporation doctrine, under which the Supreme

Court previously applied the First Amendment to the States. Thornhill v.

phasized that " * * * there was no step in the procedure before seizure designed to focus searchingly on the question of obscenity." 367 U.S. at 732, 81 S.Ct. at 1716. In that case, the mere assertion of a police officer that a publication was obscene was a sufficient basis for a court-ordered seizure. Precisely how much more "searching" the procedure prior to seizure had to be was left for later cases to clarify.

Nevertheless, in *Marcus* the Court cited approvingly Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L. Ed.2d 1469 (1957), which had upheld a State statute providing both for injunctions against distribution of obscene material, and for its seizure. Thus it appeared that even after *Marcus*, a procedure which: 1) allowed a judge to examine copies of the allegedly offensive material prior to issuance of a temporary restraining order against distribution; 2) which restrained only specified publications; and 3) which provided for a prompt judicial determination of obscenity following an adversary hearing, would be upheld as narrowly drawn to prevent the suppression of nonobscene material.

Not long after the *Marcus* decision, the Kansas Attorney General, acting under authorization of a State criminal statute forbidding the sale or distribution of obscene material, presented to a State court judge a verified Information that an obscene book was located within his county. In support of that contention, he presented to the judge copies of seven novels, six of which were among the fifty-nine novels named in the Information. The judge made a brief *ex parte* inquiry into the substance of the copies presented to him and, satisfying himself that they appeared to be obscene, he issued a warrant to search a particular location and seize all copies of the fifty-nine titles recited in the Information. Acting upon the warrant, the sheriff seized a total of 1,715 copies of some 31 different titles. At a later hearing, the judge rejected the claimant's contention that the procedure employed was unconstitutional, and subsequently found all 31 titles to be obscene and subject to destruction. Out of this chain of events came the case which provided some clarification of *Marcus*— namely, A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964) (hereinafter *Quantity of Books*).

There being no viewpoint which commanded the support of a majority of the Court, the plurality opinion held that even where the warrant authorized seizure of only specific titles (unlike *Marcus*) and even where the judge made an independent investigation into at least some of the materials before allowing any restraint on free dissemination of the material (also unlike *Marcus*), the procedure was still constitutionally deficient where the warrant allowed the sheriff to seize all copies of the specified titles and where the claimant was not afforded an adversary hearing on obscenity before seizure. *Quantity of Books*, therefore, clarified the "focus searchingly" requirement articulated in *Marcus* by holding that a judicial determination of obscenity prior to seizure, even if based upon the judge's personal examination of copies of the publications to be seized, is inadequate unless both sides have been given an opportunity to be heard in an adversary hearing. Presumably this rule is motivated at least in part by the necessity to consider the legal issues behind a determination of obscenity.

The seizure of all available copies of the books in question was held to be the second deficiency of the *Quantity of Books* procedure. It remained for subsequent cases to determine the significance of this "mass seizure" aspect of the Court's opinion, and as will be set

State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). One commentator has termed the principles articulated by *Marcus* and subsequent cases

"First Amendment Due Process." Monaghan, First Amendment "Due Process," 83 Harv.L.Rev. 518 (1970).

forth, *infra*, the results have been chaotic.

The lower federal courts, relying primarily upon *Marcus* and *Quantity of Books*, have adopted widely divergent views of the extent to which those cases mandate a hearing before various forms of restraint on free distribution of expression. Some courts have taken an absolutist attitude toward prior restraint. For example, in Bee See Books, Inc. v. Leary, 291 F.Supp. 622 (S.D.N.Y.1968), a Civil Rights action under 42 U.S.C. § 1983, the court issued an injunction restraining the Police Commissioner of the City of New York from stationing uniformed policemen in plaintiff's bookstores without a prior adversary hearing on the alleged obscenity of the materials in the store. Citing, *inter alia, Marcus* and *Quantity of Books*, the court held as follows:

" * * * the Constitution requires that *any* restraints on the distribution of publications on the ground that they are obscene, can only be imposed after an adversary judicial proceeding on the question of obscenity." (emphasis added)

291 F.Supp. at 625.

Finding that implicit in this police activity were threats of legal sanctions and other restraints against publications not found obscene, and that in fact plaintiff's sales had dramatically dropped since this activity began, the court acted against practices short of actual seizure in the absence of procedural safeguards to prevent the curtailment of constitutionally-protected expression.

The cases in which actual possession of the allegedly obscene materials has been obtained by government authorities, however, do not apply such a purist attitude. In fact, decisions subsequent to *Marcus* and *Quantity of Books* illustrate a process of carving out exceptions to the prior adversary hearing requirement, though there is not uniform recognition of any of the "exceptions." Both parties here having failed completely to consider any of these subsequent cases, I find it imperative to ex-

amine each "exception" as it might apply to the case at bar.

## PURCHASE "EXCEPTION"

I choose as a starting point the exception which appears to me to have eroded *Quantity of Books* the least.

In United States v. Gower, 316 F.Supp. 1390 (D.D.C.1970), defendant bookstore owner was found guilty of selling or possessing with intent to sell obscene material. Copies of some of the material were purchased from defendant by police undercover agents and presented to a United States Magistrate, who then issued a search warrant for defendant's store. As to the purchased materials, the court remarked:

"To require a prior adversary determination of obscenity vel non under the present facts would result in the absurdity of requiring the police undercover agents to have an adversary hearing before even making a purchase of suspected obscene materials."

316 F.Supp. at 1393.

To the same effect see Engstrom v. Robinson, 317 F.Supp. 124 (S.D.Ala.1970), and Platt Amusement Arcade, Inc. v. Joyce, 316 F.Supp. 298 (W.D.Pa.1970) (hereinafter *Platt*). Yet in both Miske v. Spicola, 314 F.Supp. 962 (M.D.Fla. 1969) and Delta Book Distributors, Inc. v. Cronvich, 304 F.Supp. 662 (E.D.La. 1969), probable jurisdiction postponed to hearing on merits sub nom. Perez v. Ledesma, 399 U.S. 924, 90 S.Ct. 2234, 26 L.Ed.2d 790 (1970) (hereinafter *Delta Book*), the court found warrants authorizing seizures of other material, which warrants were based on the purchased material, invalid, the court in *Delta* stating:

"The fact that in each case some materials were purchased rather than seized is of no moment in view of the requirement of an adversary determination of obscenity prior to arrest or threat of arrest."

304 F.Supp. at 667.

The "purchase" exception is not directly applicable here, since the govern-

ment agents in each case before me moved against the challenged materials at a time prior to their being offered for sale—i. e., at a time prior to distribution. Nor could the Government contend that since in the case of the 50 magazines, it presented photocopies of the front pages of 4 out of the 50, along with its application for a search warrant, the purchase exception can be invoked by analogy. That argument hardly answers the question of how the materials can constitutionally be brought before this Court for a determination of obscenity, since I must decide that issue only upon examination of the material "taken as a whole." *Roth, supra.* The photostats include neither excerpts from all of the 50 magazines nor the contents of any single magazine in its entirety. A materially different situation might be presented if photocopies of all publications sought to be seized, in their entirety, were given to the Court.

Thus I simply find the line of cases exemplified by *Gower* inapposite here.

### HARD CORE OBSCENITY "EXCEPTION"

Some controversy has also arisen over the necessity of a prior adversary hearing where the materials in question are hard-core pornography. In Adler v. Pomerleau, 313 F.Supp. 277 (D.Md. 1970), a § 1983 Civil Rights action by a bookstore proprietor, the court overturned the state court judge presiding at plaintiff's criminal trial who had dispensed with the hearing requirement where hard-core pornography was described in the application for the search warrant, and a previously purchased copy of the magazine in question was attached to the application, for the judge's consideration. A similar well-reasoned result was reached in United States v. Alexander, 428 F.2d 1169 (8th Cir. 1970), rev'g 313 F.Supp. 687 (D.Minn. 1969) (hereinafter *Alexander*), where the appellate court observed:

" * * * nowhere in the majority opinion [in *Quantity of Books*] do we find any suggestion that the ultimate

evaluation of the expression in issue is material to the requirement that there be a prior hearing."
428 F.2d at 1174.

The appellate court rejected the district court's reasoning that:

"Where material of this nature is patently, and indeed shockingly, obscene, the Court should not assume to conjure up the fiction that, without an adversary hearing before seizure to determine whether the material is obscene, the constitutional rights of these movants or the public under the First Amendment will be endangered."
313 F.Supp. at 690.

The Circuit Court was particularly concerned about the operation of the rule suggested by the District Court in the absence of a consensus as to what constitutes "hard core pornography," citing inconsistent results of prior judicial evaluation of identical films. See 428 F.2d at 1174 n. 7.

The Government takes the position with regard to the magazines here in question that they constitute hard-core pornography. Without deciding that question at this juncture but assuming *arguendo* that the Government is correct, I simply cannot subscribe to the view expressed by the District Court in *Alexander*. It is not an overstatement to say that one's own tastes, values and standards have been molded by a set of stimuli which are unique to him and to his cultural milieu, and those standards inevitably influence one's particular judgment as to what constitutes hardcore pornography. Another judge may find merit in a particular piece of literature which I might find utterly without redeeming social value, or vice versa. These idiosyncracies are unfortunate and inequitable enough when they result in a conviction of a man, before one judge, who might have been set free if he had been fortuitous enough to have been tried in a different court. I would have to close my eyes to reality not to admit this occurs in obscenity cases, or in fact in any case (though perhaps most

often in constitutional litigation) in which judicial temperament may affect the outcome of litigation (although I also think that the built-in checks in the judicial process minimize these inequities). It seems to me, therefore, that the last bulwark against such inconsistency is to hold inviolate the kind of procedural threshold constitutional protection articulated in *Marcus* and *Quantity of Books.* The kind of judgmental factors implicit in the hard core obscenity "exception" to the prior adversary hearing requirement cause me to reject it out of hand.

### CONCEALMENT "EXCEPTION"

Greater uncertainty surrounds yet another purported exception to the prior adversary hearing requirement: the view that a hearing is not required where the materials were concealed prior to seizure. This view finds support in United States v. Pryba, 312 F.Supp. 466 (D.D.C.1970), a criminal case in which the court upheld a procedure by which an airline freight supervisor's recital in an affidavit that a certain package, delivered to defendants' office building, contained "hard core pornography," was the basis for the issuance of a search warrant *ex parte* by a United States Commissioner. The F.B.I. agents who acted upon the warrant retrieved the package from defendants' ceiling and seized it. Only five days later were defendants offered the opportunity of an adversary hearing. Nevertheless, in holding this situation not governed by *Quantity of Books,* the court reasoned as follows:

"In the case at bar, however, the existence of a public interest in viewing these materials is not readily apparent. The furtive manner of their shipment and their concealment at their destination lend credence to the argument that these films were never intended for public display or viewing. No contention has been made that these thirty films would *immediately* have been viewed by a large number of persons or offered to the public at large. [footnote omitted] Obviously,

at the time of seizure the materials, lodged in a ceiling, were not in the public domain. For the same reasons, any resulting adverse effect on dissemination of other First Amendment protected materials is nonexistent in this case. * * * In fact, the instant case presents precisely the situation which has been recognized as an exception to the prior adversary hearing doctrine. [citing *Alexander, supra.*]" (emphasis added)

312 F.Supp. at 469.

Aside from the questionable burden of *immediate* display of publications upon which the court seemed to condition constitutional protection, the reliance upon the lower court opinion in *Alexander* for this supposed "recognized exception" has been undercut by the Eighth Circuit's subsequent reversal in *Alexander.* In particular, the appellate court commented:

" * * * the procedure required by [*Quantity of Books*] was intended to protect the constitutional right to free and full dissemination of non-obscene expression. Of course, where there is no intent to disseminate the speech, or where the dissemination is limited in scope, [footnote omitted] a smaller segment of the public will be deprived of any non-obscene material during the period of time between the seizure and the subsequent suppression hearing. However, to afford First Amendment procedural protections only to speech directed to a large segment of the public, or speech which has 'currency in the daily lives of the American people,' is to ignore the purpose of, and experience under, that Amendment. * * * Nor are we persuaded that the manner in which the material is disseminated forms a rational basis for limiting the procedural safeguards embodied in the [*Quantity of Books*] rule."

428 F.2d at 1175.

The court added:

"The *Pryba* decision seems to suggest that the material there seized was in

the private domain as opposed to the public domain. As we have just indicated the material here seized was not, we believe, intended purely for private use by the persons from whom it was seized. However, to the extent that *Pryba* draws a distinction between private and public in applying [*Quantity of Books*], it is on questionable ground. It has been held that admittedly obscene material possessed solely for private use is not subject to state regulation. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)."

428 F.2d at 1175 n. 11.

In accord with *Pryba*, however, is United States v. Gower, *supra*.

It merely need be stated that there is no evidence in either of these cases that the material was concealed or secreted at the time of the government searches nor that anything less than a public offering of these materials at each claimant's place of business was contemplated.

## MOTION PICTURE EXCEPTION

One court has consistently held (though in at least two cases by a 2–1 majority) that movie films are exempt from the requirement of a prior adversary hearing, and has upheld a procedure whereby police officers, after attending a public performance of a motion picture, have seized the exhibited copy of the film, after judging it to be obscene. Star-Satellite, Inc. v. Rosetti, 317 F.Supp. 1339 (S.D.Miss.1970); Hosey v. City of Jackson, 309 F.Supp. 527 (S.D.Miss.1970) (hereinafter *Hosey*); McGrew v. City of Jackson, 307 F.Supp. 754 (S.D.Miss.1969). The latter two opinions are presently pending Supreme Court review. In *Hosey*, plaintiffs challenged the constitutionality of the State statute under which the procedure outlined above was carried out. The majority opinion, upholding the statute, provided the following rationale for an exception to the prior adversary hearing requirement:

"This Court is of the opinion that any judicial hearing prior to the seizure of an allegedly obscene film at the time of exhibition would completely frustrate the purpose and operation of the Mississippi statute prohibiting the exhibition of obscene movies. Certainly, if a prior judicial hearing were required, it would be necessary for the hearing judge to view the film as exhibited on the occasion giving rise to the prosecution. To require a judge to proceed from one theater to another or attend numerous showings of a film at a particular theater with the mere possibility of viewing an obscene version is untenable.

Furthermore, to require that the film be brought into Court or that arrangements be made for a private showing of the film in a particular theater provides no guarantees against the cutting or alteration of the film prior thereto.

\* \* \* \* \* \*

The necessity of the seizure of an obscene movie at the time of showing cannot be compared to the seizure of obscene literature because books or magazines can always be purchased and brought before a court for a judicial hearing before a seizure is accomplished. Furthermore, literature does not enjoy the same possibility of easy deletion and alteration as is the case with a motion picture."

309 F.Supp. at 535.

One need look no farther than the magazines and books in the instant cases to illustrate the short-sightedness of the view that movies and books should be treated differently because the latter "can always be purchased and brought before a court for a judicial hearing before a seizure." It is precisely the problem of determining a constitutionally-permissible method of bringing these publications before this Court that makes these cases so vexatious. Furthermore, it is clear that *Star-Satellite*, *Hosey*, and *McGrew* comprise an aberrent line of authority. See *contra*, Bethview Amusement Corp. v. Cahn, 416 F. 2d 410 (2d Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 929, 25 L.Ed.2d 101

(1970) (hereinafter *Bethview*); Astro Cinema Corp., Inc. v. Mackell, 422 F.2d 293 (2d Cir. 1970), rev'g in part and aff'g in part 305 F.Supp. 863 (E.D.N.Y. 1969) (hereinafter *Astro Cinema*); Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (4th Cir.) cert. denied, 396 U.S. 985, 90 S.Ct. 477, 24 L.Ed.2d 449 (1969) (hereinafter *Tyrone*); United Artists Theatre Circuit, Inc. v. Thompson, 316 F. Supp. 815 (W.D.Ark.1970) (hereinafter *United Artists*); Merritt v. Lewis, 309 F.Supp. 1249 (E.D.Cal.1970); Drive In Theatres, Inc. v. Huskey, 305 F.Supp. 1232 (W.D.N.C.1969); Fontaine v. Dial, 303 F.Supp. 436 (W.D.Tex.1969), app. dismissed, 399 U.S. 521, 90 S.Ct. 2235, 26 L.Ed.2d 779 (1970). In *Bethview*, *supra*, the rationale behind requiring an adversary hearing prior to seizure even of motion pictures was expressed by the court as follows:

> "* * * it is suggested that unless the police or other local authorities have actual possession of the film pending the required adversary proceeding, the distributor may take advantage of the delay, for example, by shipping the film out of the jurisdiction or by cutting out the offending scenes. If there is a real threat of such activity, it can be controlled by an ex parte restraining order."

416 F.2d at 412.

This same point was covered in more detail in *Astro Cinema*, *supra*:

> "Both *Marcus* and *A Quantity of Books* dealt with publications; in each the police seized so many of one variety, or so many varieties, that they restrained communication of the material contained therein to a substantial audience. The State contends that seizure of this single film is clearly distinguishable; rather than seizing all copies from the distributor, they argue, they took only the one copy that he was prepared to show, and they are holding it only for the purpose of introducing it in evidence at a criminal prosecution of the theater manager and the projectionist. The difficulty with the State's position,

however, is that it does not distinguish, as we did in *Bethview*, a single copy of a book from a single copy of a film. The restraint involved in seizing a single copy of a book is exceedingly small; the dealer will usually have additional copies that can be sold. Indeed, as is often the case, it is far easier for the police to purchase one copy of the charged writings, and then introduce it into evidence. A film, however, is not directed to a single purchaser; it is aimed at all those who would be in the audience on the days that the film is scheduled to be shown."

422 F.2d at 295.

Although dealing with the problems which are peculiar to seizures of motion picture films, the above-quoted analysis from *Astro Cinema* is instructive in the instant case involving the 50 magazines. Since this was a single-copy shipment of 50 different titles, each of whose contents presumably is unique, the effect of a seizure of one of these magazines upon dissemination of expression more closely approximates the seizure of a movie from a theater than the seizure of a single copy of a book where many copies are found. That is, the material in question is rendered completely inaccessible to the public in both cases, albeit the size of the potential audience for each is vastly different. The materiality to the prior hearing requirement of the fact that single copies are involved will be considered under "Conclusions of Law," *infra*.

## SEIZURE INCIDENT TO ARREST "EXCEPTION"

I have saved for last the most contentious "exception" to the prior adversary hearing requirement which has yet arisen. Because I find it inapplicable to either of these cases, I will merely sketch its outline here, to round out the picture of judicial decisions on this issue, since the government in both of the instant actions has completely failed to indicate which, if any, "exceptions" to the hearing requirement it seeks to invoke here.

In Rage Books, Inc. v. Leary, 301 F. Supp. 546 (S.D.N.Y.1969), the court upheld a pre-hearing seizure of allegedly obscene materials when incident to an arrest on a charge of distributing those materials:

"An arrest and an accompanying seizure of specimens only of the allegedly obscene materials are another matter entirely. No decision has thus far prohibited the normal police function of effecting an arrest and the seizure of sample evidence of a suspected crime being committed. Such an arrest and a limited supporting seizure are not tantamount to a prior restraint since the jeopardy faced is essentially the restraint of obscenity law itself in respect of the remainder of the wares on the shelves and self-censorship in respect thereof at the option of the merchant.

\* \* \* \* \* \*

If the police are unable to seize the evidence on which the arrest depends, there is real danger that it will become unavailable to a prosecution before a trial of an adversary issue can be concluded."

301 F.Supp. at 549.

Similarly, in Bazzell v. Gibbens, 306 F. Supp. 1057 (E.D.La.1969), the court upheld the seizure of a film made pursuant to a search warrant which was issued without a prior adversary hearing of obscenity and which was executed simultaneously with arrests under a State criminal obscenity statute. The court reasoned in part as follows:

"I find nothing in the case law to indicate that in every case where a seizure of alleged obscene material is to be made, a pre-seizure adversary hearing is constitutionally required. Whether or not such a hearing is required must depend upon the nature and purpose of the seizure. If the seizure is made for the purpose of destroying the thing seized and for the purpose of preventing the dissemination of the material involved [then a prior hearing is required]. But where, as here, a single copy of a film is seized for the sole purpose of preserving it as evidence to be used in a criminal action to be brought pursuant to a State statute already held, in all respects pertinent hereto, to be constitutional on its face [citing *Delta Book Distributors, supra*], such a seizure cannot be said to be violative of the First Amendment's guarantees albeit a side effect of such a seizure coincidentally prevents that one particular copy of the film from being further disseminated pending the outcome of the criminal proceedings."

306 F.Supp. at 1059.

Accord, Miller v. United States, 431 F.2d 655 (9th Cir. 1970); United States v. Wild, 422 F.2d 34, 38 (2d Cir. 1969) (appeal pending, 39 USLW 3020); *Platt, supra,* 316 F.Supp. at 301; *Hosey, supra,* 309 F.Supp. at 533.

On the other hand, a substantial line of authority refuses to recognize this asserted "exception." For example, Entertainment Ventures, Inc. v. Brewer, 306 F.Supp. 802 (M.D.Ala.1969), expressed the contrary view as follows:

If a seizure with or without a warrant cannot be based solely on the conclusory assertions of a police officer, a seizure should not be allowed as incident to an arrest for displaying an obscene motion picture—the commission of this offense being based solely on the conclusory assertion of the police officer."

306 F.Supp. at 809.

Support for this latter view is found, e. g., in Cambist Films, Inc. v. Duggan, 420 F.2d 687 (3d Cir. 1969), rev'g 298 F.Supp. 1148 (W.D.Pa.1969); Metzger v. Pearcy, 393 F.2d 202 (7th Cir. 1968); Carroll v. City of Orlando, 311 F.Supp. 967 (M.D.Fla.1970); City News Center, Inc. v. Carson, 310 F.Supp. 1018 (M.D. Fla.1970); Bongiovanni v. Hogan, 309 F.Supp. 1364 (S.D.N.Y.1970) (*dictum*); Jodbor Cinema, Ltd., v. Sedita, 309 F. Supp. 868 (W.D.N.Y.1970); Gable v. Jenkins, 309 F.Supp. 998 (N.D.Ga.1969), aff'd, 397 U.S. 592, 90 S.Ct. 1351, 25 L.

Ed.2d 595 (1970) (*per curiam*); Leslie Tobin Imports, Inc. v. Rizzo, 305 F. Supp. 1135 (E.D.Pa.1969); Carter v. Gautier, 305 F.Supp. 1098 (M.D.Ga. 1969); *Delta, supra*; see also United States v. Marti, 421 F.2d 1263, 1271 n. 3 (2d Cir. 1970).[5]

Although the petition for an order to show cause in each case presently before me alleged that the Government was proceeding, at least in part, under the authority of 18 U.S.C. § 1465, no arrests of the claimants herein were made, and I simply do not see, therefore, how the incident to arrest "exception" has any application here.

## CONCLUSIONS OF LAW

■ Taking the 50 magazines case first, the precise issue before me is whether a procedure whereby the Government: 1) obtains a warrant to search premises where allegedly obscene materials are located; 2) also obtains an order to show cause why they should not be seized, which is directed to the claimants; and 3) seeks, at a hearing upon the show cause order, to introduce into evidence the material which was brought to the hearing by the claimants pursuant to a subpoena duces tecum, affords adequate protection to the constitutional right of free expression. I hold that it does.

The case before me possesses at least one unique feature. It cannot be gainsaid that where only one copy of a book is available, removal of that book from public distribution will ordinarily pose a greater restraint on expression than where many copies exist. In fact such an action may approximate the stifling of expression which follows from a mass seizure of the type struck down in *Quantity of Books*. See Demich, Inc. v. Ferdon, 426 F.2d 643, 645 (9th Cir. 1970)

(hereinafter *Demich*). Perhaps more stringent pre-seizure requirements must be imposed in this situation than where a selective seizure is effected, see, e. g., *Rage Books, supra*, but the suggested differentiation may only encourage sellers of questionable publications to send goods in single-copy lots. Since I think that the procedure employed herein was constitutionally acceptable as applied even to a mass seizure, I need not consider the suggestion posed. On this Court's view, *Quantity of Books, supra*, does not invalidate a mass seizure following an adversary hearing and a finding of obscenity.

The central issue here is the technique used for putting the 50 magazines before the Court for examination. It is certainly unorthodox, and perhaps unprecedented, for one party to move that an item be introduced into evidence which an opposing party has offered for identification only. I need not reach that exact question here, however, for I merely hold that since, as some courts have intimated, a subpoena duces tecum under Fed.R.Civ.P. 45(b) may properly be used to bring before the court for an adversary hearing materials alleged to be obscene, the procedure employed here is entirely proper. Though allowing a "seizure" by the court in a technical sense, it does not violate the First Amendment, where the period of review by the court is short. Cf. *Alexander, supra*, 428 F.2d at 1176; *Astro Cinema, supra*, 422 F.2d at 296; *Bethview, supra*, 416 F.2d at 412; and Sokolic v. Ryan, 304 F.Supp. 213, 218 (S.D.Ga. 1969). That time period in the 50 magazines proceeding has not been brief, but only because the claimants requested time to file a memorandum of law and was granted an extension of time subsequently (as was the Government).

---

5. I merely note that some courts have dealt with a closely related contention that since the arrest of an individual charged with an obscenity-related offense also has some effect on free expression, an adversary hearing must precede such an arrest. This position appears to have

been uniformly rejected. See, e. g., Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288 (S.D.N.Y.1969), aff'd sub nom. New York Feed Co., Inc. v. Leary, 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970); United States v. Fragus, 428 F.2d 1211 (5th Cir. 1970).

Even if the procedure employed here were to be seen as a type of judicial constructive seizure of the 50 magazines which I expressly deny, I agree with the court in Grove Press, Inc. v. State of Kansas, 304 F.Supp. 383 (D.Kan.1969) which reasoned that a claimant must simply be afforded a *reasonable opportunity* for an adversary hearing prior to seizure. Claimant here having been presented with a reasonable opportunity for a hearing, in which claimant refused to cooperate by offering the materials to the Court for examination, he cannot be heard to complain under *Marcus* and its progeny. See *Demich, supra*, 426 F.2d at 646. As I declared at the hearing upon the show cause order, it seems to me that unless there is a voluntary agreement to put before the Court challenged publications, enforcement of laws against obscenity would be completely stymied by claimant's view of the law. The Supreme Court could hardly have intended such an impasse.

■ The 9 cartons of books proceeding, however, is distinguishable on its facts, because in that case the F.B.I. agent took, or ordered taken, a copy of each of the questionable publications, before any hearing at all. I find that a direct violation of *Quantity of Books* occurred, and therefore I order the Government to return those copies to the claimants thereof. It simply does not afford the requisite protection to freedom of speech to allow a Government Agent to take materials out of circulation solely because of his own views as to what constitutes obscenity. Thus the action for confiscation of the 9 cartons is hereby dismissed.

### JURISDICTION OF FORFEITURE PROCEEDING AGAINST THE 50 MAGAZINES

At first blush, it might appear that having considered the constitutionality of the procedure employed to bring the magazines in question before me for review, I am moving backwards by considering subsequently the jurisdictional basis for forfeiture. I have considered the issues in this sequence for two reasons: 1) as will be seen, the discussion of the hearing requirement would have been necessary in any event; and 2) the case involving the 9 cartons of books was readily disposed of on that ground. Thus as to the 50 magazines, I must decide whether a forfeiture can be ordered under either 19 U.S.C. § 1305 or 18 U.S.C. § 1465.

■ As to § 1305, there is recent case law holding the statute unconstitutional on its face, e. g., United States v. Thirty-Seven (37) Photographs, 309 F.Supp. 36 (C.D.Cal.1970), prob. jurisd. noted, 400 U.S. 817, 91 S.Ct. 34, 27 L.Ed.2d 44 (hereinafter *37 Photographs*); United States v. Reidel (C.D.Cal., June 8, 1970) (unreported), prob. jurisd. noted, 400 U.S. 817, 91 S.Ct. 67, 27 L.Ed.2d 44; United States v. 119 Cartons Containing 30,000 Obscene Magazines, 324 F.Supp. 1112 (C.D.Cal.1970); there is authority to the effect that § 1305 is unconstitutional as applied to importers of material for private use, see, e. g., United States v. Articles of "Obscene" Merchandise, 315 F.Supp. 191 (S.D.N.Y. 1970), appeal pending, 39 USLW 3105[6]; and finally there are recent cases upholding the constitutionality of § 1305, see, e. g., United States v. 35 MM Color Motion Picture Film "Language of Love," 311 F.Supp. 108 (S.D.N.Y.1970); United States v. Fragus, 428 F.2d 1211 (5th Cir. 1970). Though not analyzing the statute under the *Marcus* and *Quantity of Books* line of cases, the court in *37 Photographs* struck down the statute as a "* * * system of censorship by customs agents [which] is barren of safeguards." 309 F.Supp. at 38. I agree with that court's analysis and expressly adopt it here.[7] The Government

---

6. A cross appeal was dismissed at 400 U.S. 935, 91 S.Ct. 246, 27 L.Ed.2d 241 (1970).

7. Since the constitutionality of § 1305 is merely drawn in question without an ap-

is therefore without authority to seek forfeiture of these magazines under § 1305.[8]

That leaves 18 U.S.C. § 1465 as the sole jurisdictional basis for forfeiture, but a reading of the statute itself discloses that it was not intended to authorize forfeiture proceedings until *after a conviction* for the substantive offense set out in the first paragraph of that provision.[9] The Government has cited to this Court no case in which there occurred a pre-conviction forfeiture under § 1465, and my independent research has disclosed none. Thus I find forfeiture unavailable in these circumstances under § 1465, and direct that the magazines be returned to their claimants.

Several courts recently have ordered the return of unlawfully seized material but have imposed the requirement that one copy of each item be made available to the prosecution in the event criminal charges are filed. See, e. g., *Alexander, supra; Metzger, supra; Tyrone, supra;* and *United Artists, supra.* This rule may appear to some extent, to nullify judicial attempts to discourage violations of the prior hearing requirement, by allowing the Government to obtain by indirection what the Court says it cannot obtain directly. That is, it may be argued that there is no effective deterrent to violation of First Amendment rights, where the Government is assured that it can obtain a copy of each of the challenged publications, even where its seizure of them is found to be unlawful. I think, however, that on balance the requirement is equitable, and I therefore order return of all the publications here in question without prejudice to the entry by this court of an order compelling the claimants to the 9 cartons of books to deliver one copy of each of the three titles in question on request of the United States Attorney for the District of Rhode Island, for use in connection with criminal prosecution, if any, under 18 U.S.C. § 1465. Similarly the return of the package of 50 magazines to the claimants thereof is subject to an order directing return to the United States Attorney of the sole copy of each of the four magazines which were specifically referred to in the affidavit of Mr. Allain, for prosecution under 18 U.S.C. § 1461 or 18 U.S.C. § 1465. I intimate no view as to the obscenity of any of these materials.

Orders shall be entered accordingly.

plication for injunctive relief against its enforcement, a three-judge court under 28 U.S.C. § 2282 is not required. See Flemming v. Nestor, 363 U.S. 603, 607, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

8. Cf. United States v. Brown, 274 F.Supp. 561 (S.D.N.Y.1967).

